**EXETER 1-A LIMITED PARTNER-SHIP, d/b/a Sheraton Inn-Airport, Petitioner, Cross-Respondent,**

v.

**The NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.**

No. 78–2048.

United States Court of Appeals, Fifth Circuit.

June 15, 1979.

Branch & Swann, John D. Marshall, David J. Zakin, Atlanta, Ga., for petitioner, cross-respondent.

Elliott Moore, Deputy Associate Gen. Counsel, John S. Irving, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Act. Associate Gen. Counsel, John G. Elligers, Frederick Havard, N.L.R.B., Washington, D.C., Curtis L. Mack, Regional Director, N.L.R.B., Region 10, Atlanta, Ga., for respondent, cross-petitioner.

Before WISDOM, CLARK and FAY, Circuit Judges.

FAY, Circuit Judge:

The question on appeal is whether there was substantial evidence in the record to support the National Labor Relations Board's decision that the union's [1] disruptive conduct did not destroy the laboratory conditions considered necessary by the Board to hold a fair election. The employer, a hotel, petitions this Court to set aside the election and order that a new election be held. The Board cross-petitions for enforcement of its order requiring the hotel to bargain with the union as duly elected representative of the hotel's employees. Finding no substantial evidence to support the Board's conclusion, we deny enforcement of the Board's order to bargain and we set aside the election and order that another election be held.

The union misconduct which taints this election occurred on three different occasions. We note that on each of these occasions, the parties involved were officials and representatives of the union. *Compare N.L.R.B. v. White Knight Manufacturing Co.*, 474 F.2d 1064, 1067 n. 3 (5th Cir. 1973) ("absence of Union agency is . . . a factor which can properly be considered").

On October 18, 1976, the employer's general manager, Stephen A. Brown, was told that Robert Lett, secretary-treasurer of union was in the lobby bar soliciting employees while those employees were at work. Brown went to the lobby and requested that Lett stop. In response, Lett became very belligerent and in a loud tone of voice said that he would come on the property any "damn time he pleased", and that Brown would have to call the police to get him out. He also threatened general manager Brown and engaged in a lot of loud cursing.

This confrontation took place in the middle of the hotel's main lobby, a relatively short distance to where employees were working both in the lobby bar and at the front desk. Security was called to the disturbance. The antagonism of Lett was such that bell captain Richard Mosley remarked to Brown afterward that the only thought he had was to run. Lett finally left through a side door by the gift shop.

After this incident, the business manager of the union, agreed to keep Lett off the property until after the scheduled election on November 12, 1976. Lett later approached a bartender in the lobby bar and indicated to her that he didn't have anything to do and that he didn't care if Brown had him arrested.

The second incident occurred on October 26, 1976, when John McCarthy, an organizer for the union, came into the main lounge of the hotel and accosted one of the cocktail waitresses, Sheridan Pierce. McCarthy called her over and started a discussion about how she felt about the union, knowing her to be against the union's presence in the hotel. Though she would walk away, McCarthy persisted by calling to her in a loud voice and on at least two occasions he grabbed her arm to compel her to stay and listen. After a time, Ms. Pierce asked the beverage manager, Hector Bouillerce, to stop McCarthy. Bouillerce sat down next to McCarthy at the bar. What ensued was a very loud and animated conversation culminating in McCarthy saying: "I am going to get you. Your ass is mine. Come the 12th, I'm going to kick your ass. You and I is going to be in a fight." This threat was heard by Harold L. Barber, a hotel security officer, by Sheridan Pierce, and by Ralph Baugher, the bartender. It is also probable that the incident involving Bouillerce and McCarthy was overheard by from three to five other cocktail waitresses, since McCar-

1. The union is known as the Hotel, Motel and Restaurant Employee's Union, Local 151, affiliated with the Hotel, Restaurant Employee's and Bartender's Union, AFL–CIO. The bargaining unit consists of all full-time and regular part-time maids, housemen, bellmen, utility employees, cooks, pantry employees, dishwashers, hostesses, waitresses and waiters, bartenders, bus help, laundry workers, receiving clerks-dock employees, maintenance employees, front desk clerks, reservation clerks and cashiers but excluding all office clerical employee. s, sales employees, the sous chefs, managers, guards and supervisors as defined in the Act.

thy was sitting no more than two feet away from one of only two bar stations where cocktail waitresses pick up their drink orders.

Subsequently, McCarthy left the lounge and about one and one-half hours later was found slumped in a chair in the lobby. He was arrested by East Point Georgia police and charged with public drunkenness.

To complete this triumvirate of hostile episodes, on November 8, 1976, four days before the election, four union representatives, including Lett, came to the hotel and were noticed drinking in the bar in the main lounge. Beverage manager Bouillerce, along with security officer G. O. Smith, approached Mr. Lett and asked Lett to leave because he had previously been advised to stay off the property. At this point, one of the representatives, Mr. Reynolds, identified himself as a lawyer and stated that Lett had nothing to say and that they had a right to be there anytime they wanted. Bouillerce and Smith asked the group to step out into the lobby. They proceeded to the lobby and stopped at a point near the front desk. The group was again asked to leave, but Reynolds insisted that they did not have to leave the premises. Bouillerce then called the East Point police. When the police arrived and asked the group to leave, Reynolds became agitated and a heated discussion ensued between Reynolds and the police. The result of that argument was Reynolds' and Lett's arrest. Two employees were working at the front desk during the argument, and the lounge had a normal complement of employees, at least one bartender and three to six cocktail waitresses.[2] At least these employees were exposed to the confrontation.

The election was held in November 12, 1976. Of the 156 employees who voted, 81 voted for the union, 62 voted against, and there were 13 challenged ballots. Approximately 40 employees failed to vote.

It appears from an examination of the record, the briefs and the orders below that the facts are not in substantial dispute. The problem arises, however, in determining what consequences must attach to these circumstances. With due deference to the Board's findings, *NLRB v. Sumter Plywood Corp.*, 535 F.2d 917 (5th Cir. 1976); *Home Town Foods, Inc. v. NLRB*, 416 F.2d 392 (5th Cir. 1969), we must nevertheless reject the Board's decision to uphold the election.

In order to be sufficient to set aside an election, "not only must conduct be coercive, but it must be so related to the election as to have a probable effect upon the employees' actions at the polls." *NLRB v. Zelrich Co.*, 344 F.2d 1011, 1015 (5th Cir. 1965). *Accord, NLRB v. White Knight Manufacturing Co.*, 474 F.2d 1064 (5th Cir. 1973). In regard to the second factor, the determination of effect on the employees' vote, the words of Judge Clark are particularly pertinent:

We are aware that, in many instances, assessing the effect of a particular action on the electorate could be a difficult, if not impossible, task. This is because detecting the subjective reaction of employees to electioneering requires an expedition into the thought processes of the electorate, a journey that administrators and courts are ill-equipped to make. To eliminate this invitation to speculate, the Board should not attempt to plumb the subconscious. Rather, the assay should seek to find whether the questioned action by an election candidate had a tendency to influence the outcome of the voting. If the challenged action had a tend-

---

**2.** It is unclear how many eligible voters actually witnessed any of the conduct described here. We are sure, however, that word of the union's or the employer's actions during this period spreads easily. "[T]he restraining effect of coercive conduct is not limited to employees directly involved. Rather, the Board and courts have long recognized that employer interrogation and threats concerning union activity during a pre-election campaign are likely to re- ceive prompt and wide circulation. Therefore, to evaluate properly the probable effect of conduct which is coercive in nature, the number of employees directly involved cannot serve as a determinative factor. The controlling factor here is whether the conduct involved tends to interfere with a free and uncoerced choice by the employees." *Int'l Mfg. Co.*, 167 NLRB 105 (1967), *quoted in Home Town Foods, Inc. v. NLRB*, 416 F.2d 392, 399 n. 14.

ency to influence the outcome of the election, then the election should be invalidated.

*NLRB v. Gulf States Canners, Inc.*, 585 F.2d 757, 759 (5th Cir. 1978).

We harbor little doubt that the union's actions were coercive; and since we also find that these actions tended to influence the election, we must set aside the election. In each of the incidents involved here, the union representatives were highly belligerent and abusive both to management and to employees. In addition, the necessity of repeated intervention by the local police belies the Board's conclusion that these acts were "mere puffery." Furthermore, where, as here, there is a series of disruptive acts, we look to the combined effect of these acts on the election. *NLRB v. Carlton McLendon Furniture Co., Inc.*, 488 F.2d 58 (5th Cir. 1974); *Home Town Foods Inc. v. NLRB*, 379 F.2d 241 (5th Cir. 1967). In an election such as this one, where the vote was fairly close and where 73 of the 196 potential votes were either challenged or not cast, election misconduct must be "more closely scrutinized." *United Steelworkers of America, AFL–CIO v. NLRB*, 496 F.2d 1342, 1347 n. 11 (5th Cir. 1974).

The union's acts here seemed designed to create an atmosphere of coercion. Although the union agreed, after the first incident with Mr. Lett, to keep him away from the hotel, he returned on at least two occasions and challenged the hotel's authority to prevent his disruptive conduct inside the hotel. Lett in fact informed an employee that he was prepared to be arrested in carrying out these activities. In addition, we simply cannot accept the hearing officer's conclusion that when union agent McCarthy said "I am going to get you. Your ass is mine. Come the 12th, I'm going to kick your ass. You and I is going to be in a fight," he was merely making "a prediction, expressed in inelegant terms, of [the election's] outcome." This statement must be considered in the context in which it was made. Bouillerce had just informed

McCarthy that he would act no differently if the union won the election. Thus, it is no surprise that McCarthy was angry, especially since he had already been drinking and acting obnoxiously. The hearing officer discounted all of this on the basis of Bouillerce's answer to the question of whether or not he felt threatened; Bouillerce responded: "He's [McCarthy] got two legs just like I have . . . We have all got to go sometime." Although this statement shows that Mr. Bouillerce may consider himself a pugilistic match for Mr. McCarthy or that he thought fisticuffs might result in serious bodily injury, we fail to see how it transforms McCarthy's statement into a mere prediction of the outcome of the election. Considered in context and in light of Bouillerce's testimony, McCarthy's statement was coercive and, together with the other acts involved here, tended to influence the election.

It is insufficient that the hotel managed to control the union representatives' actions by calling the police and that most of the misconduct was directed at management personnel. The reaction of Mosley, the security guard is an indication of the reaction of the other employees to the union's conduct.[3] "An employee might reasonably regard such threats [against a non-employee] as a reliable indicator of what would befall him if he were to refrain from joining concerted activity in support of the Union." *NLRB v. Union Nacional de Trabajadores*, 540 F.2d 1, 6–7 (1st Cir. 1976). The intimidating behavior of McCarthy and Lett were likely to be similarly predictive of their behavior toward anyone who opposed the presence of the union. Simply put, this is no way to run an election.

In conclusion, the acts of the union hardly conformed to, or facilitated, the "laboratory conditions" required by the Board. *General Shoe Corp.*, 77 NLRB 124 (1948). *See* 416 F.2d at 395–96. In so holding, we do not mean to ignore "the realities of industrial life," *Morganton Full Fashioned Hosiery*, 107 NLRB 1534, 1538 (1954). Indeed, it is

---

3. Although Mosley was not eligible to vote in the election, his reaction is nonetheless an indi-

cation of how this display probably appeared to the other employees.

recognition of these realities which leads us to the conclusion that the election was tainted sufficiently that it cannot pass as a reflection of the desires of the employees involved here. Accordingly, we deny enforcement of the Board's order, set aside the election, and order that a new election be held.

PETITION FOR REVIEW GRANTED; ENFORCEMENT DENIED.