**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**McCARTY FARMS, INC., Respondent.**

No. 93–4949.

United States Court of Appeals, Fifth Circuit.

June 20, 1994.

ion, Local 1529 (the "Union"). The Company refused to bargain after the Union won the election because it asserted that the election was tainted by pro-union misconduct. The Board, *without a hearing*, found that the Company violated § 8(a)(1) and (5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), (5), by refusing to recognize and bargain with the Union. Because we hold that the Company made a prima facie case that the pro-union misconduct impermissibly tainted the election, we deny the Board's petition and remand for a hearing.

## I

On June 18, 1992, the Board held a certification election among certain employees at the Company's Canton, Mississippi plant to determine whether the employees desired the Union to be their collective bargaining representative. Of the votes cast, 83 were for the Union, 77 were against the Union, 5 resulted in challenged ballots, and 1 resulted in a void ballot. Thus, the Union's victory hinged on but 3 votes.[1]

## II

The Company filed objections alleging Union misconduct had tainted the election. The Board's Regional Director conducted an administrative investigation into the Company's objections. After the investigation, and without a hearing, the Regional Director issued a report on July 30, 1992. The report recommended that the Board overrule the Company's objections in their entirety and that the Board certify the Union as the employees' bargaining representative. The Company filed exceptions to the Regional Director's report and supported the objections with affidavits. On December 15, the Board adopted the Regional Director's recommendations, overruled the Company's objections, and certified the Union as the employees' exclusive bargaining agent.

The Company, alleging that the Union had been improperly certified because the election was tainted, refused to bargain with the

Paul J. Spielberg, Aileen Armstrong, Deputy Associate Gen. Counsel, Robert N. Herman, NLRB, Washington, DC, for petitioner.

Andrew Partee, Jr., Kenneth J. Servay, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, LA, for respondent.

H. Frank Malone, Regional Dir., Region 15, NLRB, New Orleans, LA, for other interested party.

Before REAVLEY and JOLLY, Circuit Judges, and PARKER,* District Judge.

E. GRADY JOLLY, Circuit Judge:

The National Labor Relations Board (the "Board") petitions for enforcement of its order directing McCarty Farms, Inc. (the "Company") to bargain with United Food and Commercial Workers International Un-

---

\* Chief Judge of the Eastern District of Texas, sitting by designation.

1. If the challenged ballots are sufficient in number to have affected the outcome of the election, the Board will investigate the validity of the challenges. 5 C.F.R. § 2422.21 (as amended in 1983). In the instant case, the number of challenged ballots, 5, fell one short of requiring such an investigation. Accordingly, even a change of one of the unchallenged votes could have had an impact on the election results.

Union. Consequently, the Regional Director issued a complaint alleging an unfair labor practice under NLRA § 8(a)(5) and (1), 29 U.S.C. § 158(a)(5) and (1). On March 15, 1993, the Board denied the Company's request for a hearing, found that the Company had committed an unfair labor practice by refusing to bargain with the Union, and ordered the Company to cease and desist from such activity. Seeking judicial review, the Company refused to comply with the Board's order. Pursuant to NLRA § 10(e), 29 U.S.C. § 160(e), the Board petitioned this court for enforcement of its order.

### III

■■■■ Whether we enforce the Board's order depends on the soundness of the Board's decision to certify the Union which, in turn, depends on the validity of the election. *NLRB v. Hood Furniture Mfg., Co.,* 941 F.2d 325, 328 (5th Cir.1991). We will respect the Board's decision if it is reasonable and based on substantial evidence in the record. *NLRB v. New Orleans Bus Travel, Inc.,* 883 F.2d 382, 384 (5th Cir.1989). In challenging a representation election, the objecting party bears the burden of adducing prima facie facts that, if proven true, would invalidate the election. *NLRB v. Klingler Elec. Corp.,* 656 F.2d 76, 79 (5th Cir.1981). The objecting party must produce evidence of misconduct that "interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." *NLRB v. Golden Age Beverage Co.,* 415 F.2d 26, 30 (5th Cir.1969). To overturn a Board decision, the objecting party must submit affidavits that contain "specific evidence of specific events from or about specific people." *NLRB v. Claxton, Mfg. Co.,* 613 F.2d 1364, 1366, *clarified,* 618 F.2d 396 (5th Cir.1980). We will remand for a hearing when the objecting party raises substantial and material factual issues supported by a specific proffer of evidence which, if true, would be sufficient to set aside the election. *Gulf Coast Automotive Warehouse Co. v. NLRB,* 588 F.2d 1096, 1098 (5th

Cir.1979). We must review all of the events in their totality in making our determination. *Hood,* 941 F.2d at 330. Further, we must closely scrutinize misconduct when, as here, the election results were close. *NLRB v. Gooch Packing Co.,* 457 F.2d 361, 362 (5th Cir.1972). Taking into account all of the circumstances—including the closeness of the vote—we must determine whether the alleged misconduct violated the "laboratory conditions" necessary for a valid election. *Home Town Foods, Inc. v. NLRB,* 416 F.2d 392, 396 (5th Cir.1969). As we have previously stated:

> The "laboratory conditions" test represents an ideal atmosphere in which a free choice may be made by employees, protected from interference by employer, union, Board agent, or other parties. As to any conduct objected to as interference, the critical Board determination is whether the employees were permitted to register a free choice.

*Id.* (citations omitted).[2]

We must apply the above standards to two instances of union misconduct that the Company contends invalidates the election. First, James Jones, a pro-union employee, cursed and threatened another employee who was standing in the voting line. Second, Herman Hart, a pro-union employee, electioneered in the voting room and in areas adjacent to the voting room.

### A

■■■ In deciding whether the misconduct of an employee who was not an agent of a union, such as Jones, tainted the "laboratory conditions" necessary for a valid election, we must determine if the employee's acts "disrupted the voting procedure or destroyed the atmosphere necessary to the exercise of a free choice in the representation election." *Claxton,* 613 F.2d at 1371. In order to overturn an election based on coercive conduct, the objecting party must show that the coercive conduct is "so related to the election as to have a probable effect upon the employ-

---

**2.** Although we apply the "laboratory conditions" test, "we recognize that clinical asepsis is an unattainable goal in the real world of union organizational efforts." *NLRB v. Sumter Plywood Corp.,* 535 F.2d 917, 920 (5th Cir.1976). Accordingly, we are conscious of the "realities of industrial life" in our application of the controlling standard. *Exeter 1–A Ltd. Partnership v. NLRB,* 596 F.2d 1280, 1283 (5th Cir.1979) (quoting *Morganton Full Fashioned Hosiery,* 107 NLRB 1534, 1538 (1954)).

ees' actions at the polls." *Exeter 1–A Limited Partnership v. NLRB,* 596 F.2d 1280, 1282 (5th Cir.1979).

■ Here, the affidavits show that Jones entered the voting room at approximately 10:30 a.m. and walked toward a line of 8 to 14 employees waiting to vote. Perry Leonard was close to the end of the voting line and was wearing a "Vote No" sticker. Jones walked directly toward Leonard and loudly exclaimed, "Look at this [m.f.] here." Leonard replied, "What's the matter?" Jones kept walking directly toward Leonard and loudly stated, "Here we are trying to do something to benefit you, and here you are with a 'Vote No' sticker on." Jones continued to walk directly toward Jones—shaking his finger in Leonard's face—until he was approximately six inches away from Leonard when Leonard reacted by putting up his hands to stop Jones. Leonard responded to Jones words and actions by stating, "Man, we can go outside with this if you want." Jones retorted, "You can't win." At this point another employee caught Jones by the arm and pulled him away from Leonard. Jones then joined the voting line and remained relatively quiet until Leonard finished voting and started to leave. Jones stated, "You can't win. It's not over with yet." Another employee, Dorothy Sims, was standing toward the front of the voting line when she heard the altercation. Sims stated that she heard other employees discussing the Jones–Leonard altercation when she returned to her workplace. The Board found that Jones was not trying to pick a fight and that there was no evidence of fear among other employees sufficient to destroy the atmosphere of free choice for the election.

■ We cannot agree with Board's finding. We must reiterate that Jones's conduct took place in the voting line, moments before voting, and that some 8 to 14 voters observed and heard the confrontation. Furthermore, our disagreement with the Board is affected by the posture of the record: the Board held no hearing and we must accept all allegations of the affidavits, and all reasonable inferences therefrom, in a light most favorable to the objecting party. *See Hood,* 941 F.2d at 329; *NLRB v. Advanced Systems, Inc.,* 681 F.2d

570, 575 (9th Cir.1982). Finally, we are influenced to disagree with the Board because its pronouncements over the decades have insisted upon "laboratory conditions" for voting and the facts and reasonable inferences drawn from them show that the conditions were more typical of a picket line than a voting booth.

It is true that Jones did not make an overt statement that he was going to harm Leonard if he voted against the Union. Nevertheless, the only rational conclusion we can draw from the affidavits is that the combination of Jones's loud and belligerent cursing of Leonard and his menacing, stalking approach toward Leonard constitutes threatening and intimidating conduct directed at Leonard because of his voting choice. To be sure, Leonard, surely thought he was being threatened with an impending violent attack. The seriousness of the impact of the altercation was evidenced by the spread of the word of the incident to other employees in the plant.

The Board certainly has set aside elections based on similar, or even less, coercive conduct by employees. In *Steak House Meat Co.,* 206 NLRB 28 (1973), the Board set aside a close election when two pro-union employees threatened a single employee in order to coerce him to vote for the union or not at all. In that case, although the threats were made to a sixteen-year-old worker, they were not made on election day or in the voting line itself. *Id.* See *Westwood Horizons Hotel,* 270 NLRB 802 (1984) (setting election aside when several pro-union employees threatened several other employees before and during the election and intimidated some voters in the voting line). Here, the coercive and threatening conduct occurred *in the voting line* and was directed toward an employee voicing express disapproval of the way an employee was going to vote. *See Milchem, Inc.,* 170 NLRB 362, 362 (1968) ("The final minutes before an employee casts his vote should be his own, as free from interference as possible.") If this conduct impacted only three employees in line—or possibly only one [3]—at the time of the altercation, it would have changed the outcome of the election. *See Exeter,* 596 F.2d at 1283 (stating that a reasonable employee could regard threats di-

---

**3.** *See supra* note 1.

rected at another employee as a "reliable indicator of what would befall him if he were to refrain from [supporting] the Union") (quoting *NLRB v. Union Nacional de Trabajadores,* 540 F.2d 1, 6–7 (1st Cir.1976)). Moreover, word of the altercation was repeated among other employees during election day.[4] *See Claxton,* 613 F.2d at 1371 (stating that word of coercive conduct that spread throughout the plant created an "atmosphere of fear of coercion"); *Home Town Foods,* 416 F.2d at 399–400 (applying strict, but realistic version of "laboratory conditions" test and finding the inferential impact of union coercion invalidated election). It is true that this case lacks an overt threat of physical injury, as in *Steak House,* 206 NLRB at 29. We consider that fact of minor importance, however, because the implication of physical threats is reasonably inferred from the facts in this case: Jones's loud cursing and stalking approach, and Leonard's obvious reaction of putting his hands up in defense are ample evidence that the substance of Jones's conduct was threatening and intimidating coercion. Moreover, Jones directed his blatantly coercive conduct at Leonard, who was standing in the voting room in the voting line, specifically because Leonard's voting choice. Further, although the employee in *Steak House, id.,* did not vote because of the threats and the employees in this case did vote, we need not "plumb the subconscious" of the employees to determine whether the coercive conduct objectively impacted *how* the employees voted. *See NLRB v. Gulf State Canners, Inc.,* 585 F.2d 757, 759 (5th Cir.1978). Indeed, this conduct is far more egregious than the pro-union conduct in *NLRB v. Carroll Contracting & Ready Mix, Inc.,* 636 F.2d 111, 112–13 (5th Cir. Unit B Feb. 1981), in which we set aside an election, which was not as close as the one in the instant case, when two former employees passively urged other employees who were standing in the voting line to vote for the union. Thus, we conclude that the Com-

pany's affidavits considered in the light most favorable to the Company establish a prima facie case that would, if proven true, warrant setting the election aside, and we remand this case for an evidentiary hearing to determine if the conduct, in fact, destroyed the atmosphere of free choice necessary for a valid election.

### B

■ In view of the fact that we are remanding for a hearing instead of setting the election aside, we will further address the Company's second contention—that employee Hart's electioneering in the voting room and immediately adjacent to it tainted the election. The undisputed evidence shows that Hart entered the voting room at approximately 10:45 a.m. While in the voting room, Hart told one employee who entered the voting room, "If you're for the Union, just vote for it." Hart also shook his fist and pointed toward his Union T-shirt in a gesture of support for the Union. Hart talked to others in the voting room, but there is no evidence of the content of his conversations with others in the voting room. After he had been in the voting room for approximately five minutes, Hart left and stood immediately outside the doors of the voting room. Charlie Pate, an employee, stated that as employees entered the voting room, Hart asked them where their Union T-shirts were and whether they were afraid to wear them. Hart continued this activity for approximately five minutes. When the Company's personnel director saw him, Hart darted into a restroom. Brian Rimmer, an employee, stated that he was in the restroom, which was immediately adjacent to the voting room, and heard Hart state that the employees needed to, "Come on and do the right thing." When Rimmer and left the restroom, Hart stated to him "[You] need to come on and vote yes, now." Further, when Deborah Hubbard, an employee, came to vote with the employees from her work area, *the voting line extended*

---

4. Jones's behavior is significantly more threatening than the potentially coercive conduct in *Hood.* In *Hood,* 941 F.2d at 329, as an employee drove into the company parking lot on a day prior to the election, he was cursed and had his car swatted at with piece of union literature by an unidentified union supporter when he refused to accept that literature. There was no evidence

that other employees knew of this incident. *Id.* Thus, the potentially coercive incident in *Hood,* did not involve a physical threat by a specific pro-union employee toward the person of another employee in line to vote that was spread by word of mouth to other employees on election day.

*outside the voting room into the area where Hart and several other pro-union employees were standing.* Hart told the employees to "Vote yes" and another employee, Larry Readus, told Ms. Hubbard "You better vote yes." At approximately 11:00 a.m., Barry Sparks, the plant manager, found Hart standing near the voting room entrance talking to an employee who had not yet voted. Sparks then escorted Hart out of the plant. During Hart's activities, *approximately one-half of all eligible voters entered the voting room.*

■ The question we must address is whether, in the light most favorable to the Company, the reasonable inferences that we draw establish the Company's prima facie case—that Hart's conduct "disrupted the voting procedure or destroyed the atmosphere necessary to the exercise of a free choice in the representation election." [5] *Claxton,* 613 F.2d at 1371. In making this determination, we a guided by our previous authority. In *Carroll,* 636 F.2d at 112–13, we set aside an election when two former employees wearing union signs on their hats and shirts stood in the parking lot outside the voting area and, as the employees standing in line to vote passed by them, "urged [those] employees to vote for the union and repeatedly gestured to the 'Yes' box on the ballot pinned to their shirt[s]." *Id.* at 112–13. The activities of the two former employees in *Carroll* continued during the entire voting period. In stressing that the voting line extended beyond the official polling area, the *Carroll* Court stated:

> The Board ... argues that the electioneering was not improper because it occurred *outside* the polling place. We are not convinced. As stated by the Board in *Milchem,* the last few moments before voting should be the voters own, "as free from interference as possible." ... We do not find that this protection is reserved for

only those employees who have gained access to the actual polling place to cast their vote. Once the polls opened, *the employees waiting outside in line to vote became a part of the polling place,* and were entitled to the safeguards against interference espoused by *Milchem.*

*Carroll,* 636 F.2d at 113 (second emphasis added) (citations omitted).

In *Carroll,* 636 F.2d at 113, we cited with approval the Board's decision in *Claussen Baking Co.,* 134 NLRB 111, 112 (1961), where the pro-union employee standing "15 feet from the entrance of the polling place" urged other employees to vote for the union as those employees approached the entrance to the polling place. The Board found that the above electioneering, which continued only for fifteen minutes, nevertheless interfered with the employees' free choice in a close vote, and set the election aside. *Claussen,* 134 NLRB at 112.

■ According to the affidavits filed in this case, Hart's fifteen minutes of pro-union electioneering took place in the voting room, in the hallway outside the voting room, and in the restroom adjacent to the voting room. For the time period that the voting line extended outside the voting room, our precedent in *Carroll,* 636 F.2d at 113, mandates that we view that extension as part of the voting place itself. Thus, we must assume that Hart and the other pro-union employees, including Readus, were actively campaigning in the voting place during polling hours.

■ The Board's reliance on *Southeastern Mills, Inc.,* 227 NLRB 57 (1976), for its conclusion that Hart's restroom comments occurred outside of a *designated* no-electioneering area and thus are entitled to little weight is unpersuasive. The significance of the Board's official designation of a "no-electioneering" area for the purposes of our "atmosphere of free choice" analysis is two-fold.

---

5. Because Hart is not an agent of the union we apply the more demanding "destroys the atmosphere" standard, instead of the less demanding "tendency to influence" standard for ascertaining the impact of misconduct on the "laboratory conditions" necessary for a valid election. *Compare NLRB v. Golden Age Beverage Co.,* 415 F.2d 26, 32 n. 5 (5th Cir.1969) (applying the "destroys the atmosphere of free choice" test to conduct not attributable to the union) *with Gulf States*

*Canners,* 585 F.2d at 759 (applying the "tendency to influence the outcome of the election" test to misconduct attributable to the union), *cert. denied,* 452 U.S. 906, 101 S.Ct. 3033, 69 L.Ed.2d 407 (1981). *See M & M Supermarkets, Inc. v. NLRB,* 818 F.2d 1567, 1570–73 (11th Cir.1987) (discussing Fifth Circuit precedent regarding the appropriate standards of review for acts attributable to parties to the election and for acts attributable to nonparties).

First, the official designation indicates that the Board Agent believed the area was so close to the voting polling place that it was too sensitive to allow any electioneering to take place there. In the instant case, the Board Agent instructed the Union observer and the Company observer to "check the [voting] room, bathroom, and hallways before the parties arrived to witness the opening of the ballot box to make sure that no election paraphernalia had been left there." Thus, the Board Agent acknowledged that the restroom and hallway were sensitive areas. Second, official designation is significant because it identifies the sensitive areas to all employees and agents. Here, Hart, after seeing the Company's personnel manager looking at him in the hallway attempted to avoid detection by darting into the restroom. Obviously, Hart clearly knew that it was improper to be in the hallway or in the restroom after he had voted. Thus, his presence in these sensitive areas indicated that he was knowingly attempting to influence voters improperly as they approached the voting room—during the voters' most crucial decision period. *Accord, Claussen,* 134 NLRB at 112 (setting aside election where electioneering took place 15 feet from entrance to polling place). The pro-union content of Hart's communications,[6] the fact that some of Hart's, Readus's, and the other pro-unions employees' conduct was directed at voters in line to vote within and without the voting room, and the fact that the balance of Hart's conduct was directed at employees in areas that the Board Agent considered sensitive strongly indicates an impact on the free choice of the voters.[7] Again,

the Company has established a prima facie case that requires remand for an evidentiary hearing to determine whether in fact the alleged misconduct "disrupted the voting procedure or destroyed the atmosphere necessary to the exercise of a free choice in the representation election." *Claxton,* 613 F.2d at 1371.[8]

### IV

For the foregoing reasons, the Board's petition is denied and the case remanded.

DENIED and REMANDED.

---

6. The Board's contention that Hart's communications were not sufficiently "prolonged" to justify setting aside the election is without merit. The key to the "prolonged" requirement in *Milchem,* 170 NLRB at 362–63, was the presumption that any communication that was not "chance, isolated, [and] innocuous" possessed an electioneering content. In the instant case, the affidavits show that Hart's comments had a clear pro-union electioneering content. Further, to read *Milchem* to require more than a momentary pro-union communication to each employee would fly in the face of our precedent in *Carroll,* 636 F.2d at 112–13, where the electioneering was directed toward employees as they passed by the union supporters in the voting line. Finally, any argument that the mere fifteen minutes spent by Hart was insufficient to have an impact on the voters is directly contradicted by the Board's own decision in *Claussen,* where the electioneering conduct "only continued for 15 minutes." *Carroll,* 636 F.2d at 113 (citing *Claussen,* 134 NLRB at 112).

7. Hart's electioneering was substantially more extensive than the electioneering conduct in *Hood.* In *Hood,* 941 F.2d at 329, two former employees made pro-union remarks only to two employees at or near the voting booth, and later went out into the plant where they had discussions of unknown content with unknown employees.

8. Because we hold that either Jones's coercive conduct or Hart's electioneering is sufficient to warrant remand for an evidentiary hearing, we need not address the Company's third contention regarding an acknowledged Union agent's, Dotson's, attempt to give a Union T-shirt to a voter before the polls opened for the evening voting session. The Board may wish to take evidence on this matter and consider it when it holds the hearing on remand.