103 F.3d 130
 154 L.R.R.M. (BNA) 2352
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
WINTZ DISTRIBUTION COMPANY, Respondent.
 No. 95-6033.
 United States Court of Appeals, Sixth Circuit.
 Dec. 03, 1996.
 
 On Application for Enforcement of an Order of the National Labor Relations Board, No. 9-CA-32604.
 ORDER ENFORCED.
 Before: MARTIN, KRUPANSKY and DAUGHTREY, Circuit Judges.
 PER CURIAM.
 
 
 1
 The National Labor Relations Board petitions this court for enforcement of its order requiring Wintz Distribution Company to bargain with the General Teamsters Local Union No. 836, which has been certified by the Board as the exclusive bargaining representative of an appropriate unit of the company's employees following a certification election. Wintz Distribution contends that union agents engaged in impermissible electioneering during the polling hours and argues, therefore, that the election result should be set aside. We disagree, and we thus conclude that the Board's petition for the enforcement of its order should be granted.
 
 I. PROCEDURAL HISTORY
 
 2
 The National Labor Relations Board found that Wintz Distribution had violated §§ 8(a)(5) and (1)[1] of the National Labor Relations Act (29 U.S.C. § 158(a)(5) and (1)) by refusing to bargain with General Teamsters Local Union No. 836, affiliated with the International Brotherhood of Teamsters, AFL-CIO, which had been certified by the Board as the exclusive bargaining representative of the appropriate unit of Wintz Distribution's employees.
 
 
 3
 The company has its principal place of business in Minnesota and furnishes personnel to businesses engaged in trucking, distribution, and warehousing operations. On January 23, 1993, the union filed a representation petition with the Board and sought certification as the collective bargaining representative of Wintz Distribution's drivers assigned to its Cincinnati, Ohio, and Dayton, New Jersey, facilities. On March 27 and 28, 1993, pursuant to a stipulated election agreement, the Board conducted a secret-ballot election at the two facilities. Of the 65 eligible unit employees, 38 voted in favor and 18 voted against union representation. Each location had two voting sessions, from 12:00 p.m. to 4:00 p.m. on March 27, and from 9:00 a.m. to 1:00 p.m. on March 28.
 
 
 4
 The company filed objections to the election and alleged, among other reasons, that the union had engaged in impermissible electioneering in the polling area and had otherwise interfered with employees who were attempting to vote. The company further alleged that the union had engaged in objectionable activity by distributing hats bearing the legend "Go Teamsters" in the polling area while the employees voted.
 
 
 5
 After determining that Wintz Distribution's objections raised substantial material issues, the Board conducted a hearing on the objections. The hearing officer issued a report and recommendation to the Board, concluding that the company's objections should be overruled in their entirety and recommending that the union be certified as the employees' bargaining representative. Wintz Distribution then filed exceptions to the hearing officer's report to the Board. The Board subsequently issued a Decision and Certification of Representative, in which it adopted the hearing officer's findings and recommendations and certified the union as the employees' bargaining agent.
 
 
 6
 The company has refused to bargain with the union. As a result, the union filed an unfair labor practice charge, and the Regional Director, acting on behalf of the Board's General Counsel, issued a complaint alleging that the company violated of §§ 8(a)(5) and (1) of the Act by refusing to bargain with the union. The company then filed an answer to the complaint, admitting its refusal to bargain, but challenging the validity of the Board's certification of the union. The General Counsel filed a motion seeking summary judgment.
 
 
 7
 The Board granted the General Counsel's motion for summary judgment, concluding that all the issues that the company raised had or could have been litigated in the previous representation proceeding. The company, the Board found, did not offer any new evidence nor any special circumstances justifying the reexamination of the Board's previous decision certifying the union as the employees' bargaining representative. Consequently, the Board found that the company had committed an unfair labor practice by refusing to bargain with the union.
 
 
 8
 Wintz Distribution now seeks review of the Board's order requiring it to bargain with the union. The Board has cross-petitioned for enforcement of its order.
 
 II. FACTUAL BACKGROUND
 
 9
 Wintz Distribution alleges that Local 836, through its agents, engaged in improper electioneering in the employer's Cincinnati facility on March 27, the first day of the election, and otherwise interfered with employees who were attempting to vote. The credited evidence reveals that the Cincinnati facility consists of a garage, an office building, a fuel island, and 11 acres of trailer parking. The polling place was a small room located inside the office building. In order to reach this polling room, drivers entered the office building through a steel door that was known as the "drivers' entrance," traveled down a hallway, then through a doorway into a 14-by-14 foot room called the "drivers' room." The voters then climbed several steps, passed through another door and entered into the voting room. The Board agent conducting the election posted a "voting place" sign near the door to the polling room, on the door to the drivers' room, and on the exterior door utilized by the drivers.
 
 
 10
 Six witnesses appeared before the hearing officer. Walters, a terminal manager for the Cincinnati facility, testified that during the March 27 voting session he observed the union's secretary/treasurer, Janalyn Miller, and Darrell Howard, a union trustee, sitting or standing by the bench located beside the drivers' door to the office building until approximately 2:30 p.m. He stated that he witnessed Miller and Howard pass out hats bearing the union's logo and twice observed them talking to groups of eligible voters for five to ten minute periods. Walters, however, never heard Miller or Howard directly urge voters to vote pro-union. The hearing officer generally credited Walters' testimony.
 
 
 11
 Two drivers, Woodrum and Sanderson, who also testified on behalf of the employer,[2] stated that Miller and Howard distributed hats that bore the slogan "Go Teamsters" to the drivers. Woodrum testified that Miller and Howard were standing near several drivers who were urging their co-workers to support the union, but did not themselves participate in the discussions. According to Woodrum, however, Miller and Howard did repeatedly state "Go Union" as they handed the hats.
 
 
 12
 According to Sanderson, after he had voted, he asked Miller some questions regarding the numbers of available holiday and vacation days if the union should win the election. He also testified that his co-worker, Philpot, remained outside for three or four minutes speaking with Miller, Howard, and the other drivers while Sanderson voted. The evidence is clear, however, that the voting line never extended beyond the doorway.
 
 
 13
 The union presented Howard as its chief witness before the hearing officer. Howard testified that he and Miller remained outside the drivers' entrance to the office building shortly before the polls opened at 12:00 p.m. on March 27, until about 1:30 p.m. that afternoon. According to Howard, although the Board agent overseeing the election instructed him and Miller to leave the building, she did not protest their presence immediately outside the drivers' entrance.
 
 
 14
 Howard admitted that he and Miller carried a box of hats bearing the slogan "Teamsters" or "Go Teamsters" but testified that most drivers helped themselves to the hats. Howard also recalled engaging in conversations that lasted a couple of minutes with the drivers but testified that he did not indulge in campaign talk. He also testified that most of the drivers voted first, entered the office building without stopping, then congregated around the bench for a few minutes to talk among themselves or with Miller and himself. The hearing officer found Howard to be a credible witness in all substantive respects.
 
 III. ANALYSIS
 
 15
 The party seeking to overturn a Board-conducted election bears a heavy burden. Boston Insulated Wire & Cable Sys. v. N.L.R.B., 703 F.2d 876, 880 (5th Cir.1983). The party challenging the Board's refusal to set aside the results of a representation election must "show that the election was not fairly conducted." Dayton Hudson Dep't. Store v. N.L.R.B., 987 F.2d 359, 363 (6th Cir.1993) (citations omitted). In addition, the Board's findings of facts are conclusive "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); Dayton Hudson, 987 F.2d at 363.
 
 
 16
 The objecting party must present by "specific evidence ... not only that the unlawful acts occurred, but also that they interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." Tony Scott Trucking, Inc. v. N.L.R.B., 821 F.2d 312, 316 (6th Cir.1987) (per curiam) (quoting N.L.R.B. v. Golden Age Beverage Co., 415 F.2d 26, 30 (5th Cir.1969), cert. denied, 484 U.S. 896 (1987)).
 
 
 17
 Wintz Distribution contends that the election result should be overturned because union agents allegedly engaged in impermissible electioneering during polling hours on March 27, 1993. The company argues that the union agents violated the Board's per se rule stated in Milchem, Inc., 170 N.L.R.B. 362, 362 (1968), "that ... sustained conversation with prospective voters waiting to cast their ballots, regardless of the content of the remarks exchanged, constitutes conduct which, in itself necessitates a second election." Id. We note, however, that the Board has also cautioned that "[its] application of this rule will be informed by a sense of realism.... [The rule] does not mean that any chance, isolated, innocuous comment or inquiry by an employer or union official to a voter will necessarily void the election." Id. at 363.
 
 
 18
 Subsequent Board decisions and decisions of this court, furthermore, have established that "[w]here the conversation is not prolonged, and where it does not involve party representatives' conversing with voters waiting in line to vote or in the actual polling area, Milchem is inapplicable." Dayton Hudson Dep't Store, 987 F.2d at 364 (emphasis added); see Marvil Int'l Sec. Serv. Inc., 173 N.L.R.B. 1260, 1260 (1968). If these precise elements are not present, in fact, the Board must "make[ ] a judgment, based on all the facts and circumstances, whether the electioneering substantially impaired the exercise of a free choice so as to require the holding of a new election." Boston Insulated Wire & Cable Sys., 703 F.2d at 880 (quoting Glacier Packing Co., 210 N.L.R.B. 571, 573 n. 5 (1974)).
 
 
 19
 In this case, substantial evidence supports the Board's finding that Howard and Miller did not violate Milchem's per se rule, because the alleged misconduct neither occurred within the polling area nor with employees waiting in line to vote--the two places where Milchem applies. First, the voting line never extended out the drivers' entrance to the area where Miller and Howard were stationed. Second, record testimony substantially supports the Board's finding that the area outside the drivers' entrance was not a polling area. According to Howard's testimony, the Board agent requested the union agents to "leave the building" and raised no objections when she later found them positioned outside the drivers' entrance. The Board could, therefore, reasonably infer that only the voting room, the drivers' room, and the hallway outside the drivers' room constituted "no electioneering" areas. Marvil Int'l, 173 N.L.R.B. at 1260 (holding that the demarcation of a "no-electioneering" area should be left in the first instance to the informed judgment of the Board's agents conducting the election).
 
 
 20
 Nor did the Board err when it ruled that the conduct engaged in by the union representatives at the polling area did not substantially interfere with the free choice of the voters. As stated above, when Milchem does not apply, "the Board makes a judgment, based on all the facts and circumstances, whether the electioneering substantially impaired the exercise of free choice so as to require the holding of a new election." Dayton Hudson Dep't Store, 987 F.2d at 364 (citations omitted).
 
 
 21
 Our review of the record indicates that the employer never produced evidence that the union agents engaged in coercive or intimidating conduct that interfered with the free choice of voters. The record is devoid of any facts that tend to demonstrate that the union agents' alleged conduct disrupted the voting procedure or created an atmosphere hostile to the exercise of free choice. In fact, the evidence is, at best, unclear as to whether Howard and Miller even spoke with a substantial number of employees before they voted. Howard gave credited testimony that he did not "ask anyone to vote for the union." He also testified that two or three drivers stopped on their way to the voting room to ask how they were doing and engaged in conversations which lasted "for a couple of minutes." According to Howard, most drivers first voted and then congregated by the bench to talk among themselves or converse with the union agents. There is simply no indication that the union agents threatened, confused, pressured, or unduly influenced the voters. We therefore conclude that there is substantial evidence in the record to support the Board's determination in this case. Indeed, the Board's reasonable inferences may not be displaced on review even if the court might have reached a different result on de novo review. Tony Scott Trucking, 821 F.2d at 313.
 
 
 22
 The cases that the employer relies on to support its contention, furthermore, are clearly distinguishable. Both Kitchen Fresh, Inc. v. N.L.R.B., 716 F.2d 351 (6th Cir.1983), and N.L.R.B. v. McCarty Farms, Inc., 24 F.3d 725 (5th Cir.1994), involved the threshold question of whether the employers had established a prima facie case of coercive electioneering in voting lines or polling areas and whether the Board erred in overturning election results without holding evidentiary hearings. Thus, the reviewing court merely inquired whether "the objecting party raise[d] substantial and material factual issues" which, if proven, warranted invalidating the election. McCarty Farms, 24 F.3d at 728. In the present case, the Board first acknowledged that substantial and material issues existed and held an evidentiary hearing before rendering a decision.
 
 
 23
 In addition, in Kitchen Fresh the employer alleged that union agents loitered in the polling area, which displayed the Board's standard election notice prohibiting electioneering or loitering; that union agents made thinly veiled threats against employees and, in one instance, carried out the threat by slashing the employee's tires; and that 8-30 pro-union employees engaged in electioneering before voters who were waiting in line to vote. Kitchen Fresh, 716 F.2d at 358-59. Clearly, the facts are more egregious in Kitchen Fresh and raised substantial and material issues not only as to whether the voters' free choices were impaired but also as to whether the union agents' behaviors violated the Milchem rule.
 
 
 24
 Similarly, in McCarty Farms, the employer proffered specific evidence that a pro-union employee cursed and threatened another employee standing in the voting line and that another pro-union employee electioneered in the polling room, in the hallway outside the voting room, and in the restroom adjacent to the voting room that the Board agent had officially designated as "sensitive." McCarty Farms, 24 F.3d at 732.
 
 
 25
 Wintz Distribution also relies on Claussen Baking Co., 134 N.L.R.B. 111 (1961), for its contention that Howard and Miller's activities near the drivers' entrance constituted coercive electioneering. Claussen, however, is also clearly distinguishable from the present case. The Board set aside the election in Claussen after determining that an employee, accompanied by company management, engaged in improper electioneering of several newly hired employees within 15 feet of the polls. The Board agent specifically stopped the employee from continuing his electioneering and thereby demarcated the areas as a "no-electioneering" sphere. The Board, furthermore, specifically noted its concern that the margin of victory in this case was slim--the union had lost by one vote.
 
 
 26
 In the present case, the Board agent never asked Howard and Miller to remove themselves from the drivers' entrance despite a clear opportunity to do so. The union, furthermore, won by a margin greater than 2-to-1.
 
 
 27
 The company further argues that the union's distribution of baseball caps to employees outside the office building impaired the voters' exercise of free choice and rendered the election invalid. First, the available evidence fails to establish whether Miller and Howard distributed the hats to employees before they voted; in fact, Howard testified that most employees picked up their hats after they had voted. In addition, the Board has repeatedly held that the distribution of inexpensive campaign materials such as T-shirts, buttons, and stickers is permissible. R.L. White Co., 262 N.L.R.B. 575, 576 (1982) ("A T-shirt has no intrinsic value sufficient to necessitate our treating it differently than other types of campaign propaganda, which we do not find objectionable or coercive."); Van Leer Containers, Inc. v. N.L.R.B., 841 F.2d 779, 785 (7th Cir.1988) (noting that merely encouraging employees to express their support for the union by wearing pro-union hats on election day does not constitute objectionable conduct).
 
 
 28
 We conclude that the Board's determination that the election should not be set aside is supported by substantial evidence. We therefore GRANT the Board's petition for enforcement of its bargaining order.
 
 
 
 *
 (a) It shall be an unfair labor practice for an employer--
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 ....
 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
 29 U.S.C. § 158(a)(1) and (5).
 
 
 [2]
 Three drivers testified for the employer, but the hearing officer chose not to credit the third driver's testimony due to "several logical inconsistencies" and the witness's "personal demeanor while testifying."