**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**April 8, 2005**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 04-60416

_____


LAMAR COMPANY, LLC d/b/a
LAMAR ADVERTISING OF JANESVILLE,

                                Petitioner-Cross-Respondent,

                    versus

THE NATIONAL LABOR RELATIONS BOARD,

                                Respondent-Cross-Petitioner.

_____


Petition for Review of an Order
of the National Labor Relations Board
(30-CA-16706)

_____



Before SMITH, DENNIS, and PRADO Circuit Judges.
PER CURIAM:[*]

    This case is before the court pursuant to a petition for
review of an order of the National Labor Relations Board entered on
April 30, 2004 directing the petitioner, Lamar Company LLC, d/b/a/
Lamar Advertising of Janesville, to enter into negotiations with

_____

    [*] Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

International Union of Painters and Allied Trades, District Council No. 7, AFL-CIO.[1] Lamar is a Louisiana company engaged in the business of manufacturing, erecting, marketing, and maintaining commercial billboards throughout the United States. Lamar operates a facility in Janesville, Wisconsin, including area offices and a shop where billboards are painted and built. The instant case arises out of an election held at that facility in which a bargaining unit of sixteen employees were given the option of joining the Union. The election was held on January 5, 2001 and the Union prevailed by a vote of nine (9) to seven (7), a margin of one vote. Lamar filed objections to the validity of the election results with the Board, which were overruled by a hearing officer. In due course, the Board adopted the hearing officer's findings and recommendations. Lamar refused to bargain with the Union in order to question the propriety of the representation election.[2] On January 27, 2004, the Union filed a petition with the Board

---

[1] The order also found that in failing to bargain with the Union, Lamar engaged in unfair labor practices pursuant to §8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 151 *et. seq.*

[2] "Representation proceedings are not subject to direct review by this court. In order to secure judicial review of his objections to an election, the employer must refuse to bargain with the certified union thus committing an unfair labor practice and causing the Board to issue an order to bargain requiring judicial enforcement. The representation case and the unfair labor practice case become one and the complete record is fully reviewable." *NLRB v. Osborn Transp., Inc.*, 589 F.2d 1275, 1278 (5th Cir. 1979)(citations omitted).

alleging violations of §§8(a)(1) and 8(a)(5) of the National Labor Act. The Board issued a complaint against Lamar for its failure to bargain, and Lamar filed an answer contesting the underlying propriety of the representation election. On a motion for summary judgment, the Board issued a Decision and Order directing Lamar to bargain with the Union. In response, Lamar filed this Petition for Review raising seven issues. We deny the petition for review and grant enforcement of the Board's decision.

*Standard of Review*

This court will affirm the Board's decision "if it is reasonable and supported by substantial evidence on the record considered as a whole." *Valmont Indus. v. NLRB*, 244 F.3d 454, 463 (5th Cir. 2001). "Substantial evidence is 'such relevant evidence that a reasonable mind would accept to support a conclusion.'" *Poly-America, Inc. v. NLRB*, 260 F.3d 465, 476 (5th Cir. 2001)(citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). "We review questions of law de novo, but defer to the legal conclusions of the Board if reasonably grounded in the law and not inconsistent with the Act." *Id.* (citations omitted).

*Analysis*

"In challenging a representation election, the objecting party bears the burden of adducing prima facie facts that, if proven true, would invalidate the election." *NLRB v. McCarty Farms, Inc.*,

3

24 F.3d 725, 728 (5th Cir. 1994) (citing *NLRB v. Klingler Elec. Corp.,* 656 F.2d 76, 79 (5th Cir. 1981)). The party which objects to the representation must produce evidence of misconduct that "interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." *Id.* (citing *NLRB v. Golden Age Beverage Co.,* 415 F.2d 26, 30 (5th Cir. 1969)). Where the election results were close, allegations of misconduct must also be closely scrutinized. *Id.* (citing *NLRB v. Gooch Packing Co.,* 457 F.2d 361, 362 (5th Cir. 1972)). Keeping this in mind, we consider each of the issues Lamar has raised in turn.

**Issue 1: Alleged Threat to Weber**

Lamar alleges that the Union Business Manager William Moyer threatened employee Dan Weber's employment, pension, or other benefits when, about fifteen minutes before the polling period and twenty-five feet away from the breakroom where the polling would take place, Moyer told Weber that he "should think long and hard on how he would vote because the union would be the one making his wages."

We agree with the Board's finding, that Moyer's statement did not constitute a threat of job loss, and was at worst a misrepresentation of the Union's control over employees' wages. Courts have remarked that rank-and-file employees know that a union

4

does not have such control. *See NLRB v. Tio Pepe Inc*., 629 F.2d 964, 971 (4th Cir. 1980); *NLRB v. Sauk Valley Mfg. Co., Inc*., 486 F.2d 1127, 1131 (9th Cir. 1973). "[E]mployees must generally be trusted to sort through election propaganda and posturing in deciding how to vote." *Trencor v. NLRB*, 110 F.3d 268, 276 (5th Cir. (5th Cir. 1997). Therefore, Moyer's purported statement about wages would not have interfered with the employee's exercise of free choice. As such it is not a basis for overturning the election.

**Issue 2: Alleged Threats to Dygart**

Lamar alleges that the election was flawed because Jason Dygart, an employee who voted for the Union, did so because of threats made against him. Mr. Dygart was a brushcutter on a three man crew. Prior to the election, Dygart's co-workers, including Steve Jones, told Dygart, apparently on more than one occasion, that if he didn't vote for the Union, "we're going to kick your ass." Mr. Dygart's testimony, however, indicates that he considered these statements normal worksite joking, "just a way of talking" and not threats of actual bodily injury. Lamar alleges that the comments constitute threats which effected the outcome of the election. The Board decided that these co-workers were not union agents and applied a test for third party conduct. The Board's factual determination that Jones was not an agent was

5

supported by substantial evidence on the record as a whole, particularly considering the lack of evidence that the Union ever gave Jones any authority to act as its agent.

The existence of an agency relationship is a factual determination. *Poly-America*, 260 F.3d at 480. Common law principles apply in determining agency status. *Id.* "'Apparent authority' exists where the principal engages in conduct that 'reasonably interpreted' causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Restatement (Second) of Agency § 27 (1992). The burden of proving an agency relationship falls on the person asserting its existence, in this case, Lamar. *Id.*

Lamar argues that Jones was an agent of the Union because Jones held organization meetings in his home, distributed Union literature to eligible employees, and was entrusted with the task of inviting other employees to Union meetings. Holding union meetings, even without the presence of union officials, has been held to be inconclusive evidence of agency. *L & A Juice Co.*, 323 NLRB 965 (1997). Here, there is not even evidence that Jones organized or conducted these meetings. Nor is the distribution of union literature necessarily indicative of agency status. Jones's role in distributing the literature was merely to pick up copies of handouts made available at meetings in response to the Union representative's request that "the last one out the door stick them

6

in the shop" the next day.  The Sixth Circuit has held that even members of an in-plant organizing committee tasked with distributing information and soliciting authorization cards had "so few responsibilities and such limited authority that they could no be mistaken for agents." *Kux Mfg. Co. v. NLRB*, 890 F.2d 804, 809 (6th Cir. 1989).

*Cablevision Systems of New York City Corp.*, the case Lamar cites to support its position, is readily distinguishable because the individuals found to be agents of the union in that case were union members, not employees of the target company who had been expressly asked by the union to organize on the employer's premises. 312 NLRB 487 (1993).  The individuals were part of what was known as the "Cablevision Organizing Committee" and there was no evidence that any union official participated in the organizing campaign, lending support for a finding that the union held out the four individuals as its representatives. *Id*. at 491.  In contrast Jones was an employee and not a member of any organizing committee. In addition, at Lamar, Union officials were actively engaged in organizing activities.

In agreeing with the Board's finding that Jones was not an agent of the Union, we also agree that the appropriate test is that applied to third-party conduct.  The Board will only set aside an election on the basis of third-party threats if the conduct is "so aggravated as to create a general atmosphere of fear and reprisal

7

rendering a free election impossible." *Westwood Horizons Hotel*, 270 NLRB 802, 803 (1984); *see also Hobbs v. Hawkins*, 968 F.2d 471, 476 (5th Cir. 1992). The objecting party bears the burden of showing that the conduct warrants setting aside the election. *Cal-West Periodicals*, 330 NLRB 599, 600 (2000). In evaluating the conduct of a third party, the Board considers several factors including: (1) the nature of the threat; (2) whether the threat encompassed the entire bargaining unit; (3) whether reports of the threat were widely disseminated within the unit; (4) whether the threat was 'rejuvenated' at or near the time of the election; (5) whether the person making the threat was capable of carrying it out; and (6) whether from an objective standpoint, it is likely that the employees acted in fear of the speakers capacity to make good on the threat. *Westwood Horizons*, 270 NLRB at 803.

Applying those factors to the instant case, as the Board did, we find that the Board's conclusion that the conduct of Dygart's co-workers fell short of a general atmosphere of fear and reprisal is correct. The remarks, while literally physical threats, appear to have been in the nature of normal workplace kidding around. The remarks were made to only one member of the voting unit, who apparently told no one else until after the election. We note, however, that these two factors should carry little weight in the context of an election decided by only one vote. The remarks do not appear to have been repeated near the election. And while the

8

person or people making the remarks may have had the physical ability to carry them out (the record does not reflect any particular advantage conferred by size, inclination, or training), it is not clear that Mr. Dygart took them seriously or subjectively believed that his co-workers would "kick his ass." Mr. Dygart did, however, apparently decide to vote for the Union, and while a reasonable reading of his testimony indicates that his mind was changed by ordinary peer pressure and comradery and not physical threats, there is a possibility that his vote was affected by the remarks. Objectively, given the context described in Mr. Dygart's testimony, it is unlikely that a reasonable employee in Dygart's position would have been frightened.[3] We conclude that the Board's finding that "the record did not show that 'under all the circumstances, a reasonable employee in Dygart's position would have been put in fear by the threat,'" is reasonable and supported by substantial evidence.

**Issue 3: Alleged Threats to Voit**

Lamar alleges that the Union threatened employee Daniel Voit

---

[3] *See Abbott Labs. v. NLRB*, 540 F.2d 662, 667 (4th Cir. 1976)(noting that in an industrial setting, language like "I'm going to kick your ass" was common hyperbole not expected to have coercive impact.); *Leaseco, Inc.*, 289 NLRB 549, 552 (1988)(describing the statement "I'll kick your ass" as "a profane colloquialism used commonly to verbalize the speaker's desire to prevail over another person or group," and that "standing alone...it does not convey a threat of actual physical harm.").

9

that if he did not vote for the Union he risked losing retirement benefits due to him through his membership in another union, the International Brotherhood of Electrical Workers, Local 890. The record shows that at the request of a Union official, Leo Sokolik, a representative for Local 890 called Voit. During the conversation, Sokolik told Voit that he had heard that Voit was planning on voting against the Union and asked why. Voit told him that other employees had not included him in their discussions of the Union or asked for his opinion. Sokolik told him that he shouldn't vote but that "if you do vote you should vote yes because you're a union member." There is no evidence that any mention was made of Voit's employment, pension, or benefits. Voit expressly denied that Sokolik mentioned his pension. After the call, Voit told others that he felt unfairly singled out, but an attempt to draw on the sympathy of a voter's previously indicated pro-labor sympathy is hardly synonymous with a threat. The Board's finding that Voit was not threatened with a loss of employment, pension, or other benefits was reasonable and supported by substantial evidence.

**Issue 4: Electioneering at the Polling Area**

Lamar also asserts that the election must be set aside because the Union, through its alleged agent Jones, engaged in improper electioneering on the day of the election. As explained above, we

reject Lamar's argument that Jones was an agent of the Union. On the morning of the election, simultaneous with or prior to the opening of the polls, Jones approached two of his co-workers and showed them a note handwritten by union representative Moyer the day before, which stated that Moyer pledged to stop negotiating on the unit employees' behalf if they believed negotiations were not being conducted to their benefit. Both men voted about fifteen minutes after seeing the note. Lamar argues that this conduct violated the rule found in *Milchem, Inc.* against electioneering in the form of "prolonged conversations between representatives of any party to the election and voters waiting to cast ballots...." 170 NLRB 362 (1968). Jones's limited circulation of the handwritten note, without evidence of more is not reasonably characterized as a "prolonged conversation" and as noted Jones was not an agent of the Union. Further, Jones's behavior did not "disrupt[ ] the voting procedure or destroy[ ] the atmosphere necessary to the exercise of a free choice in the representation election." *NLRB v. Carroll Contracting & Ready-Mix, Inc.,* 636 F.2d 111, 113 (5th Cir. 1981).

**Issue 5: Union Expenditures**

Lamar argues that the election must be set aside because in providing food and beverages at pre-election meetings, the Union bestowed excessive gifts upon employees. The Union spent

11

approximately four hundred dollars ($400) on refreshments over seven meetings at local bar and grills.  In addition, about three weeks before the election the Union sponsored a dinner at "The 615 Club," for seven employees, their significant others and the Union Business Manager Moyer and his wife.  The Union spent eight-hundred fifteen dollars ($815) on the dinner, including a generous two-hundred dollar tip.  Providing food and drinks at organizational meetings is normal and the Board "will not set aside an election simply because the union...provided free food and drink to the employees." *Chicagoland Television News, Inc*., 328 NLRB 367, 367 (1999); *Kux Mfg*., 890 F.2d at 810.  The provision of food and drinks is only objectionable where the benefit is conditioned upon the employee's support or the expense is so exorbitant it amounts to a bribe.  *See NLRB v. Hood Furniture Mfg. Co.*, 941 F.2d 325, 330 (5th Cir. 1991); *Kux Mfg*., 890 F.2d at 810.  We agree with the Board that these expenditures were not so excessive as to amount to bribes, nor do we find evidence that the food and drink was conditioned on the employee's support.

**Issue 6: Meetings at a Bar and Grill or a Strip Club?**

In a related arguement, Lamar complains about the locale of five of the Union's pre-election organizational meetings.  These meetings were held at a local bar and grill that shares a building with a strip club. Lamar argues that the Union's decision to hold

meetings there violated Board policy prohibiting discrimination. The evidence confirms that the meetings were confined to the bar and grill area and that the Union paid only for food and drinks. Although the bar and grill shares a common entrance with the strip club, the two are physically separate and patrons may enter the strip club only after paying a cover charge. There was no evidence that any Union related activity drifted into the strip club. The Board's conclusion that the fact that meetings were held in the same structure as a strip club does not warrant reversal of the election was reasonable.

**Issue 7: Leather Jacket**

The last issue raised by Lamar is an alleged promise made to one of the employees with regard to a leather jacket. The employee in question is Jones, again. A few days before the election, Jones and another employee met with Union business manager Moyer and the Union's international representative, B.J. Cardwell, for several hours. Cardwell was wearing a leather jacket with Union insignia, available for purchase by Union members for one-hundred ninety-nine dollars ($199). The evidence indicates that throughout the evening Jones repeatedly admired the jacket, mentioning that he wanted one for himself and asking how he could get one. Both Moyer and Caldwell refused to answer him. Finally, after several hours of such badgering, Jones asked, "hey if we win this can I get a coat,"

13

and Moyer responded in the affirmative. We agree with the Board that at most this was an ambiguous exchange and not an offer of quid pro quo. This conclusion is particularly reasonable given that Jones was one of the more avid union supporters among the employees (he was involved enough in the organization efforts that Lamar has asserted that he was a Union agent) and his vote was probably considered certain by the Union representatives by the date of this conversation.[4] There was no suggestion that Jones would be given the coat for free or even for a discount. The existence of the jackets or the possibility of obtaining them was not mentioned beyond the very small group present for Jones's entreaties. The lone ambiguous conversation with a confirmed Union supporter is not sufficient to cast suspicion on the election.

*Conclusion*

We do not find cause to overturn the election for any of the above listed reasons alone, or in combination. The cumulative impact of a number of insubstantial objections does not amount to a serious challenge meriting a new election. *See NLRB v. White Knight Mfg. Co.*, 474 F.2d 1064, 1067-68 (5th Cir. 1973). Accordingly, Lamar's petition to set aside the order of the Board is DENIED, and the Board's petition for enforcement is GRANTED.

---

[4] It is, however, logical to assume that a jacket with Union insignia was commonly available only to Union members and that this is why Jones could not buy one before the election.