**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LABOR SERVICES, INC., Respondent.**

**No. 83–1207.**

United States Court of Appeals,
First Circuit.

Argued Sept. 8, 1983.

Decided Nov. 7, 1983.

John D. Burgoyne, Asst. Gen. Counsel, Washington, D.C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., were on brief, for petitioner.

Robert P. Corcoran, Boston, Mass., with whom Stoneman, Chandler & Miller, Boston, Mass., was on brief, for respondent.

Before COFFIN, Circuit Judge, FAIRCHILD *, Senior Circuit Judge, and BREYER, Circuit Judge.

COFFIN, Circuit Judge.

This case presents the question whether the National Labor Relations Board permissibly found that a representation election resulting in a union victory was not tainted when a union representative supplied free alcoholic drinks to most of the electorate before, during, and after the election.

The Regional Director overruled the employer's objections to the election. The Board, by a 3–2 decision, without elaboration, adopted the Regional Director's findings and recommendations that a certificate of representative should issue. The subsequent unfair labor practice charge of unlawful refusal to bargain, in violation of section 8(a)(5) and (1) of the National Labor Relations Act, was accordingly decided by summary judgment in favor of the union, and the company was ordered to bargain upon request. The Board now applies to us to enforce the order.

The election was held between 5:00 p.m. and 7:00 p.m. at a Howard Johnson Motor Lodge in Pawtucket, Rhode Island. The total number of voters was 18. The final vote was 13 for the union and 5 against. Although there is another somewhat different version of what happened, the Regional Director—and the Board—accepted the following version given by the employer's witnesses:

"At about 4:15 p.m., [petitioner union's] Business Manager Richard Stromberg and two other men entered the bar. At about 4:30 p.m., five or six other men entered the bar together. Stromberg greeted the men and told them that their drinks would go on his tab, that he would not allow the bartender to take their money. Stromberg instructed the bartender that the men's drinks were on him. The five or six men stayed and drank, while Stromberg and the two men with whom he had entered left briefly and then returned. Shortly before 5:00 p.m., two or three of the group of five or six men finished their drinks and appeared to be leaving. At this time, Stromberg stated in a voice that could be heard throughout the bar that there was no hurry, that there were still a few minutes before

* Of the Seventh Circuit, sitting by designation.

they had to vote, and that there was time for another drink. Stromberg again reminded the men that all their drinks were to go on his tab. After a few more minutes, the five or six men left together, and as they did so, Stromberg said, 'Don't forget how to vote.' A few minutes later, the same men came back into the bar and continued to drink on [Stromberg's] tab. The original group of men was then gradually joined by other men entering the bar until, eventually, there were 12 to 15 men drinking in the bar on Stromberg's tab. Around 6:20 p.m., Employer's President Robert Blanchette and the Employer's attorney, Robert Corcoran, also entered the bar and spoke with [Pawtucket police officers] Champagne and Randall."[1]

The Regional Director, in concluding that the union business manager's conduct did not warrant setting aside the election, relied on several subsidiary findings: (1) that there was no evidence of "advance inducement of the employees to come to the bar or to vote for the [union] in order to get a free drink"; (2) that there was no evidence of coercive statements; (3) that there was no evidence that any employees were inebriated; (4) that the value of the drinks was not "sufficient to interfere with the employees' free choice"; and (5) that the incident occurred outside the polling area.

We are well aware of the deference given the Board in exercising its discretion in connection with rulings concerning representation elections and the heavy burden on a party to show that this discretion has been abused. *New England Lumber Division of Diamond International Corp. v. NLRB*, 646 F.2d 1, 3 (1st Cir.1981); *Fall River Savings Bank v. NLRB*, 649 F.2d 50, 56 (1st Cir.1981). Nevertheless, having in mind the Board's own oft-articulated objective "to establish in election proceedings conditions as nearly ideal as possible to determine the uninhibited desires of the employees", *Rattan Art Gallery Ltd.*, 260 N.L.R.B. No. 18, 109 LRRM 1149, 1150 (1982) (*citing General Shoe Corp.*, 77 N.L.R.B. 124, 127 (1948)), the extent to which its prior decisions fall short of encompassing the facts in this case, the absence of any rational guidance in the five factors relied upon by the Regional Director, and the grave policy implications for future elections, we reluctantly decline to enforce the order.

To begin with the last of these considerations, we think it helpful to focus a sharp if harsh light on the policy implication of the Board's ruling. The precise holding is that a union may station a well-funded representative in a bar within a brief walk of a polling place where he may with impunity open the bar to unlimited free drinks to all voters before, during, and after the election, may in fact pay for drinks served to at least two-thirds of the electorate, and may accompany this generosity both by pressing the invitation to drink more and by reminding the electorate not to "forget how to vote". A corollary of this ruling, not mentioned by the Regional Director or the Board, is that an employer may also station its perhaps better funded representative in a bar and offer even the higher priced brands of alcoholic beverage on the same terms to the electorate. Board counsel at oral argument acknowledged the reciprocal application of this ruling. The prospect of such a bibulous competition between union and employer hosts near and during polling seems to us an atavistic return to turn-of-the-century pursuit of votes through the discriminating distribution of alcohol.[2]

1. Officers Champagne and Randall were present in the bar on an unrelated assignment throughout these events. The employer Labor Services, Inc. provided the testimony of both officers to the Regional Director in support of the employer's objections. Not quoted by the Regional Director but included in the testimony assumed as controlling was this additional statement:

   "At 6:00 p.m. the bartenders changed shifts. The male bartender going off duty went to settle up with Stromberg and Stromberg took out a heavy roll of bills and paid the tab. Stromberg then started a new tab with the female bartender who came on duty and made sure she understood that all of the men were drinking on him."

2. Respondent has pointed out that many states have enacted statutes proscribing the sale or

The observations of the Regional Director, which the Board deemed satisfactory limitations justifying the ruling in this case, do not in our view withstand analysis. First, the absence of "advance inducement" and coercive statements cannot realistically make a difference. Even assuming that the union business manager did not advertise in advance his presence in the bar, he managed to buy drinks for 12 to 15 voters in the electorate of 18 voters. It is the effect of the union business manager's activities, not his or the union's motives, that disturbs us here. *See Cross Baking Co. v. NLRB,* 453 F.2d 1346, 1348 (1st Cir.1971). The receipt of unlimited free drinks during an election accompanied by the reminder not to forget how to vote can hardly be justified simply because a previous bargain has not been spelled out. And the absence of coercive statements is immaterial in a case such as this one where a campaigning party's tactics take the form of friendly cajolery rather than ugly intimidation.

Second, the absence of evidence of inebriation offers no better basis for drawing a line. If it were thought to offer such, breathalyzers and similar apparatus would be standard gear for representation elections.[3] Here the presence of alcohol is more than minimal; the union bought drinks for at least two-thirds of the electorate during a two-hour period. The salient point is, to use the standard endorsed by the Board in, among many cases, *Weyerhaeuser Co.,* 247 N.L.R.B. 978, 978 n. 2 (1980), that "the conduct reasonably tends to interfere with the employees' freedom of choice in the election. . . ." Inebriation is not the only

form of interference; induced fellowship is another. One is reminded of scenes from Edwin O'Connor's *The Last Hurrah* (1956), such as that where a veteran politician muses on the efficacy of his ward club's annual Spring Dance:

"One got people together dancing and singing and eating and drinking, and sometimes, drugged by good spirits and the temporary feeling of fellowship, they said things and did things and agreed to things which, under more normal circumstances, they would have considered mad. It was politically very valuable." *Id.* at 84.

Third, the similar point that the value of the drinks was insufficient is not more persuasive. The monetary value may well have been considerable; how much of the union representative's "heavy roll of bills" was disbursed does not appear. More to the point, the reality and appearance of the impropriety of buying drinks for voters is not triggered by a specific figure. State statutes proscribing gifts of liquor to voters do not make such distinctions. Nor do Board precedents. The cases cited to us by the Board which find payments unobjectionable all involve, as indeed it characterizes them, cases where "money or gifts are given in return for a service rendered, or are in furtherance of the election process, and their receipt is not contingent upon the voters' support in the election."[4] Even if the giving of drinks was not explicitly contingent on the support of the voter, we see no suggestion of any service rendered or any assistance given to the election process.[5]

---

gift of alcoholic beverages while the polls are open as well as laws specifically barring gifts of liquor, however small, to influence voters.

**3.** That such a scenario is not the product of our imagination is illustrated by the following argument in the Board's brief: "[T]he Company never offered any evidence to the Board concerning the voters' actual state at the time they cast their ballots, the amount they had to drink, or even what they were drinking."

**4.** *See, e.g., NLRB v. Klingler Elec. Corp.,* 656 F.2d 76 (5th Cir.1981) (union reimbursement of day's wages for requested attendance at Board

hearing); *NLRB v. Gulf States Canners, Inc.,* 634 F.2d 215 (5th Cir.1981) (union payment for gasoline to transport workers to union meetings); *Heavenly Valley Ski Area v. NLRB,* 552 F.2d 269 (9th Cir.1977) (reasonable union reimbursements to election observers).

**5.** *See, e.g., NLRB v. Savair Mfg. Co.,* 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973) (impermissible to give pre-election waiver of $10.00 maximum initiation fee); *Collins & Aikman Corp. v. NLRB,* 383 F.2d 722 (4th Cir.1967); *Easco Tools, Inc.,* 248 N.L.R.B. 700 (1980) (impermissible to pay election observers significantly more than lost wages); *General Cable*

Finally, the fact that the incident occurred outside the polling area is descriptive, not exculpatory. By definition the provision of drinks at a bar near but not at the polling place does not occur inside the polling area. We know that an inevitable tension exists between the necessity of appraising an election "realistically and practically, . . . and not . . . against theoretically ideal, but nevertheless artificial standards", *The Liberal Market, Inc.,* 108 N.L.R.B. 1481, 1482 (1954), and the aspiration voiced in *Milchem, Inc.,* 170 N.L.R.B. 362 (1968): "The final minutes before an employee casts his vote should be his own, as free from interference as possible." In *Boston Insulated Wire & Cable Co.,* 259 N.L.R.B. 1118 (1982), enf'd, 703 F.2d 876 (5th Cir.1983), pamphleteering was permitted outside glass-paneled doors which were only ten feet from the polling place. But the effects of the strident voice and the crumpled flyer quickly dissipate when the doors are closed; the physical and psychological effects of rounds of convivial drinks just consumed in an adjacent bar enter the polling area.

We have examined all the precedents relied on by the Board and find none concerning the furnishing of free liquor during an election. In *Movsovitz & Son, Inc.,* 194 N.L.R.B. 444 (1971), one witness, in other matters discredited, had said that a union representative had promised, well before an election, to buy employees beer and wine after the union won. The Board properly held that in any event such a promise could not reasonably be expected to have influenced the employees' free choice. Two years earlier, in *Jacqueline Cochran, Inc.,* 177 N.L.R.B. 837 (1969), the gift by a union of a free turkey to each employee to attend a union campaign meeting, where no elec-

tion had yet been scheduled, and a union-sponsored Christmas party were held not to be objectionable. Neither case can be considered remotely analogous.[6]

The closest precedent is *Lach-Simkins Dental Laboratories, Inc.,* 186 N.L.R.B. 671 (1970), where, in a 2 to 1 decision, the Board upheld the Regional Director, who had overruled objections to an election where the union provided a free lunch of sandwiches and soft drinks at midday in a basement before and during the election, which was conducted in a room at the top of a 26 foot high stairway. Some 15 to 20 of 44 voters partook. The Board relied on the facts that the luncheon was not held so close to the polling area and the value of sandwiches and soft drinks were not so large as to interfere with the election. To rely on such a case, without discussion or analysis, as governing the instant case, in short to equate the likely effects of a tuna on rye and Pepsi with a double scotch, leaves us unpersuaded.

The considerations urged on us by Board counsel do not withstand analysis or reflect any special expertise. We think the case at bar is different in kind from all other cases, is fraught with serious implications, and demands some helpful guidance for both unions and employers. We therefore decline to enforce the Board's order. This specific outcome should not be read to detract from the general principle of judicial deference to Board discretion in the supervision of the NLRA election process.

At the same time we acknowledge that, as the dissenting Board members pointed out, there seem to be substantial and material questions of fact created by non-employer witnesses which warrant resolution by a hearing. That is, the version of the facts relating to the offer and provision of

Corp., 170 N.L.R.B. 1682 (1968) (impermissible for union to give $5.00 gift certificate to voters); *Performance Measurements Co., Inc.,* 148 N.L.R.B. 1657 (1964) (impermissible for employer to promise $6.00 shoe allowance).

**6.** Not relied on below by the Board but cited in its brief are *Peachtree City Warehouse, Inc.,* 158 N.L.R.B. 1031 (1966); *Lloyd A. Fry Roofing Co.,* 123 N.L.R.B. 86 (1959); *Ra-Rich Mfg. Co.,*

120 N.L.R.B. 1444 (1958); *The Zeller Corp.,* 115 N.L.R.B. 762 (1956). All of these cases involve the serving of drinks or dinner as part of *pre-election* activities. The two additional cases cited in the dissenting opinion, *Albion Malleable Iron Co.,* 104 N.L.R.B. 225, 226–27 (1953); *Cooper's Inc.,* 94 N.L.R.B. 1554, 1556 (1951), also involved drink-buying prior to, but not during, a representation election.

drinks which the Regional Director, the Board, and we have accepted for the purpose of decision may be subject to significant change. We therefore remand this case to the Board for further proceedings. *Costs awarded to respondent.*

BREYER, Circuit Judge (dissenting).

The Labor Board decided not to set aside a representation election simply because a union representative bought some drinks for some of the voting employees. The Board rested its decision on the sum total of special features of the individual case—no "advance inducement" to come to the bar, no coercive statements, no inebriation, a small dollar value, some distance from the polling place, and no conditions. The Board's members, in deciding the case, divided three to two. The fact that the Board found this a close case, however, does not make it close in this court. Rather, this case presents precisely the type of minor, detailed, interstitial question of labor election policy that Congress asked the Labor Board, not the courts, to decide. *Cf. NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 130–31, 64 S.Ct. 851, 860–61, 88 L.Ed. 1170 (1944) (determination of coverage of Act in borderline cases assigned primarily to Board).

I do not understand what specific law or legal rule the Board has violated. Its action does not, in any obvious way, violate the terms of its enabling statute—a statute which simply provides (insofar as relevant here) that if the Board directs an election by secret ballot, it "shall certify the results thereof." 29 U.S.C. § 159(c)(1). Nor has the agency violated its own rules. *Cf. Arizona Grocery Co. v. Atchinson, Topeka & Sante Fe Railway Co.,* 284 U.S. 370, 389, 52 S.Ct. 183, 186, 76 L.Ed. 348 (1932) (agency must follow its own rules). The Board, from the beginning, has stated that its objective is "to provide a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees." *General Shoe Corp.,* 77 N.L.R.B. 124, 127 (1948). And it has made clear that it will consider the validity of providing refreshments on a "case by case" basis.

*Lach-Simkins Dental Laboratories, Inc.,* 186 N.L.R.B. 671, 672 (1970).

The Board has interpreted its policies in this area consistently. *Cf. Sunbeam Television Corp. v. FCC,* 243 F.2d 26, 28 (D.C.Cir. 1957) (agency must consistently apply its own policies). In prior (though less egregious) cases, it has allowed drinks. *Jacqueline Cochran, Inc.,* 177 N.L.R.B. 837, 839 n. 1 (1969); *Peachtree City Warehouse, Inc.,* 158 N.L.R.B. 1031, 1039–40 n. 1 (1966); *Lloyd A. Fry Roofing Co.,* 123 N.L.R.B. 86, 87–88 (1959); *Albion Malleable Iron Co.,* 104 N.L.R.B. 225, 226–27 (1953); *Cooper's Inc.,* 94 N.L.R.B. 1554, 1556 (1951). In the closest precedent, *Lach-Simkins Dental Laboratories, Inc., supra,* it allowed the union to serve a free lunch of sandwiches and soft drinks near the polling place during the election. The difference between "lunch and soft drinks" and "no lunch but one or two hard drinks" is more obvious to my brethren than to me. Perhaps it is a matter of hunger versus thirst.

The court apparently believes that the Board's decision is "an abuse of discretion," 5 U.S.C. § 706, and simply substitutes its judgment for that of the agency. Courts do not often second-guess agencies on discretionary matters of substantive policy directly related to their statutory missions. K. Davis, *Administrative Law Treatise* § 29.00–1, at 520 (Supp.1982). And this case illustrates why. The question here is how this record might reasonably strike a body expert in labor relations. Why could that body not find the incident simply trivial? More important, why could it not see endless practical difficulties in policing strict rules that prohibit workplace associates from buying drinks for one another? Human nature being what it is, might not some drink-buying often prove inevitable and its presence offer a ready-made excuse to those seeking to delay or to prevent certification? The presence of these questions, not their answers, is sufficient to convince me that the Board's decision is not unreasonable.

Nor ("The Last Hurrah" notwithstanding) does the Board's decision run contrary to public policy. Drinks and elections are a subject that the public still debates. Mas-

sachusetts, for example, prohibited political committees from spending money on "intoxicating liquors," 1946 Mass.Acts ch. 537, § 10, changed its mind in 1973, 1973 Mass. Acts ch. 285, changed its mind again in 1974, 1974 Mass.Acts ch. 859, § 4, and changed its mind for a third time in 1975, 1975 Mass.Acts ch. 151, § 1 (codified at Mass.Gen. Laws Ann. ch. 55, § 6). At the moment, Massachusetts does not prohibit these expenditures. Nor is federal policy much different. On October 6, 1983, the Federal Election Commission voted unanimously to allow a corporation to provide a "hospitality suite" at which it could serve drinks to delegates at the Republican and Democratic National Conventions. FEC Advisory Opinion 1983–23 (treating food and alcoholic drinks similarly).

Now that the majority has distinguished the "tuna fish on rye with Pepsi" from the "double scotch" what is next? Will we have to decide where beer and hamburgers fit on the spectrum? If the basic division of tasks between administrative agency and court continues to have meaning, *see FPC v. Idaho Power Co.,* 344 U.S. 17, 20–21, 73 S.Ct. 85, 86–87, 97 L.Ed. 15 (1952), the members of the National Labor Relations Board, not the members of this court, should decide the content of the labor/management election day menu.