**REVISED**

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 96-60130
_____


TRENCOR, INC.

Petitioner-Cross-Respondent,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross-Petitioner.

_____

Petition for Review and Cross-Application for Enforcement of
an Order of the National Labor Relations Board
_____

April 8, 1997

Before REYNALDO G. GARZA, JONES, and DeMOSS, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Trencor, Inc., a manufacturer of heavy construction
equipment petitions for review of the National Labor Relations
Board (the "Board") order directing Trencor to bargain with the
United Steelworkers of America (the "Union"). Trencor contends
because the Union promised "the biggest party in Texas" if it won
the election and dared the company illegally to match union
"guarantees" to workers, the election was tainted. The Board
cross-petitions for enforcement of its order. Although the Board's
treatment of the "guarantees" was not unreasonable, the Board

failed to analyze the promise of a post-election party consistently with the Regional Director's facts and this court's precedent. We must therefore deny enforcement of the bargaining order and remand for further proceedings.

## I.  Background

On August 3, 1995, Trencor's maintenance and production employees voted on whether the Union would serve as their exclusive collective-bargaining representative. Of 99 eligible voters, 70 voted for representation and 26 voted against.[1] Trencor filed objections to the election, but, after an administrative investigation without a hearing, the NLRB Regional Director issued a report recommending that Trencor's objections be overruled and that the Union be certified. The Board adopted the Regional Director's recommendations and certified the Union as the exclusive collective bargaining agent for the employees.

After certification, Trencor refused to bargain with the Union. In November 1995, the Union filed an unfair labor practice charge and the Regional Director subsequently issued an unfair labor practice complaint. Trencor's answer admitted its refusal to bargain, but alleged that Union misconduct tainted the election and that the Union's certification was invalid. In its February 26, 1996 Decision and Order, the Board granted the General Counsel's motion for summary judgment, concluding that Trencor's objections

---

[1]Nine ballots were challenged, but this number was insufficient to affect the election outcome.

were or should have been litigated in the representation proceeding and that no new evidence or special circumstances warranted reexamination of the representation proceeding. The order affirmatively requires Trencor to bargain with the Union, post appropriate notices, and comply with the Union's requests for information.

On appeal, Trencor concedes that it has refused to bargain, but challenges the Board decision to certify the Union. Trencor's challenge centers on three alleged improprieties committed by the Union on the eve of the election.

## II. Standard of Review

The Board's decision will be upheld by this court if it is reasonable and supported by substantial evidence in the record. NLRB v. McCarty Farms, Inc., 24 F.3d 725, 728 (5th Cir. 1994). The Board is given a "wide degree of discretion" in resolving election disputes. NLRB v. A.J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 328 (1946); NLRB v. New Orleans Bus Travel, Inc., 883 F.2d 382, 384 (5th Cir. 1989). An objecting party must demonstrate that any improprieties "interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." NLRB v. Golden Age Beverage Co., 415 F.2d 26, 30 (5th Cir. 1969). See also NLRB v. Rolligon Corp., 702 F.2d 589, 592 (5th Cir. 1983) ("the need for a ... new election is judged not against a standard of perfection, but against the likelihood that the outcome of the election might have been affected"). Since the

3

Board resolved this issue at summary judgment without conducting a hearing, we must accept all allegations presented by Trencor's evidence and all reasonable inferences in a light most favorable to Trencor. McCarty Farms, 24 F.3d at 729.

### III.  Alleged Union Improprieties

#### A.  Promise of the "Biggest Party in Texas"

Trencor complains that the Union offered conditional inducements to win employee support in the election.  The day before the election, Union agent Bill Fears told employees that if the Union won the election, it would host "the biggest party in the history of Texas," and that the Union would buy "all the food and beer."  Trencor primarily relies on NLRB v. Lou Taylor, Inc., 564 F.2d 1173 (5th Cir. 1977), and Crestwood Manor, 234 NLRB 1097 (1978) to argue that such conditional inducements render the election invalid.

In Lou Taylor, this court enforced a Board order in which the announcement of a company's annual Christmas party in an employer's campaign speech the day before the election was found to be illegal. 564 F.2d at 1175.  The company president promised that there would be a Christmas party and "that the employees would be paid for the time spent at the party and for the holiday." Id.  An administrative law judge and the Board found, and this court affirmed, that the announcement improperly influenced the employees' choice despite the fact that the employer customarily gave its employees a Christmas party.  Id.  The election was

4

invalidated notwithstanding the overwhelming rejection of the union. Lou Taylor, Inc., 226 NLRB 1024, 1030 n.10 (union received only 38 of 223 votes cast).

In Crestwood Manor, the Board invalidated an election because of a union's promise to hold a one hundred dollar raffle for employees if the union won the election. 234 NLRB at 1097. The Board stated that:

> The Employer argues that since the Petitioner's raffle was conditioned upon Petitioner's prevailing in the election, the Hearing Officer correctly concluded that it was a promise of benefit which requires setting aside the results of the election. We find merit in the Employer's contention. ... If we were not to so find, we might well envision future elections in which employers and unions alike might be tempted to promise employees all sorts of inducements -- raffles, prizes, vacation trips, or whatever -- if their side won the election. Such an intrusion into the election process would be highly undesirable.
> ***
> Even if it could be said that the raffle was worth only $1.18 [one in eighty-five chance of winning one hundred dollars] to each employee, we could hardly countenance an offer of $1 to each employee for a union victory or loss.

Id.

The Board argues on appeal that a promise to hold a party is qualitatively different from a promise to give a monetary benefit. Relying on the Third Circuit's decision in NLRB v. L& J Equipment Co., 745 F.2d 224, 231 (3d Cir. 1984),[2] the Board asserts

---

[2]The Board also relies on several other cases which do not involve parties conditioned on a Union victory, but rather involve pre-election parties. Because pre-election parties induce employees to hear the message of the sponsor and

5

because they are not conditioned on the sponsor's victory, the Board has tended to allow them. See, e.g., Peachtree City Warehouse, Inc., 158 NLRB 1031, 1035-36, 1039-40 (1966) (employer-sponsored dinner with music, dancing, and liquor shortly before election held proper); Lach-Simkins Dental Laboratories, 186 NLRB 671, 671-672 (1970)(union-sponsored free luncheon at the time and near the place of polling held proper).

The only two cases, other than L&J Equipment, that involve promises of post-election parties or meal and alcohol purchases are Movsovitz & Son, Inc., 194 NLRB 444, 78 LRRM 1656 (1971) and R.H. Osbrink, 114 NLRB 940 (1955). In citing Movsovitz, the Board quotes the part of the decision stating that the "Board has long since held that the supplying of meals or alcoholic beverages at a party is not necessarily coercive or destructive of an atmosphere in which a free choice can be made." 78 LRRM at 1656. However, the cases cited by Movsovitz for the quoted proposition all involved *pre-election* purchases of meals and beverages. See Lloyd A. Fry Roofing Co., 123 NLRB 86, 87 (1959) (union party held the day prior to the election); Zeller Corp., 115 NLRB 762, 764 (1956) (employer provided dinner for employees on company time without loss of pay three days prior to election); Ohmite Manuf. Co., 111 NLRB 888, 888-89 (1955) (union bought food and drink at tavern the night before the election).

Movsovitz itself did involve a promise that a union employee "would buy beer and whiskey for the Movsovitz employees" after the "Union won the election." 78 LRRM at 1656. The Board acknowledged that "the fact that such promise was conditioned on a union victory in the election is troublesome," but went on to conclude that the promise involved a "type of minimal gratuity" that "is not such an emolument as can reasonably be expected to influence the employees' free choice in the election." Id. However, once again, the precedent cited in support of this proposition involved a pre-election gift. See Jacqueline Cochran, Inc., 177 NLRB No. 39, 71 LRRM 1395(pre-election gift of a turkey to employees allowed since the purpose of the gift was to encourage attendance at pre-election meeting). Furthermore, even though the Board did say in Movsovitz that it was assuming the promise was made, the Board tipped its hand in the prior paragraph, opining that "the only evidence of the alleged promise to purchase beer and whiskey is the uncorroborated testimony of one witness, who was discredited in other aspects of her testimony. In such circumstances we question whether such a promise was in fact made." 78 LRRM at 1656.

The Movsovitz rationale is difficult to square with the Board's diligent fight against conditional $1.18 gifts in Crestwood Manor. In any event, Movsovitz does not help the Board since neither it nor the Regional Director ever found that the Union's promise of the "biggest party in the history of Texas" was a "minimal gratuity" that would not influence the employee's free choice. In fact, the Regional Director stated that the Union's promise "may have served as a possible inducement to get employees to vote for the Union... ."

In Osbrink, the union "distributed a leaflet in which it urged employees to vote for it and then attend a victory party that evening." 114 NLRB at 942. The opinion's sole analysis of the issue is a recitation that the Regional Director disagreed with the employer's interpretation of the leaflet as a "form of bribe" and "considered it to be a legitimate form of campaign propaganda." Id. The Board adopted the Regional Director's recommendations. Id. at 943. There is no indication in the opinion as to what was involved in the "victory party," particularly as to what, if anything, the union was purchasing for the employees' benefit. Furthermore, the Regional Director's determination in Osbrink that the leaflet was "propaganda" and not a "form of bribe" is ambiguous: it could mean that the Regional Director did not believe the union was actually planning to provide any sort of benefit to employees. The Osbrink decision is also in tension with the Board's later decision in Crestwood Manor. In any event, the Regional Director's determination in this case that the party may have affected employee decisions distinguishes Osbrink.

6

that offering a victory party is not necessarily "inimical to an atmosphere in which free choice can be made." Promising a party which only lasts one night, the Board alleges, would not "substantially influence employees in a decision having a major effect on their working lives." Id. The Board distinguishes Lou Taylor on the ground that the employees were to be paid for attending the Christmas party, while in this case the victory party was not coupled with a monetary benefit. Similarly, the Board distinguishes Crestwood Manor, noting that the raffle represented a direct financial benefit contingent on the union victory, a notion the Board finds more offensive than the promise of a party.

The Board's reasoning on appeal might be persuasive if it comported with the facts administratively found. But the Regional Director's recommendations, adopted in full by the Board, admitted that the Union's party invitation "may have served as a possible inducement to get employees to vote for the Union." The Regional Director then concluded that "it does not amount to impermissible coercion [in] the absence of a linkage between the party and either a pre-election pledge of Union support or an actual vote for the Union," citing Nu Skin International, Inc., 307 NLRB 223 (overruling employer's objection to union's passing out t-shirts before the election only to employees who signed a pro-union

petition).  On appeal, the Board neither cites <u>Nu Skin</u> nor relies on the Regional Director's rationale.[3]

Furthermore, Trencor contends that the monetary/non-monetary distinction drawn by the Board is not meaningful, since the benefits promised by the Union have some monetary value. Trencor also points to potential problems with this distinction, noting that substantial non-monetary benefits could potentially be more problematic than the $100 raffle in <u>Crestwood Manor</u>.  The Board itself warned of the temptation to offer "all sorts of inducements" as a reason for finding the raffle to be illegal. 234 NLRB at 1097.

Ultimately, we are persuaded that the Board can not adopt the recommendation of the Regional Director, which notes that offering a party conditioned on the Union victory "may have served as a possible inducement to get employees to vote for the Union ..." but rests on flawed legal analysis, and then argue on appeal

---

[3]Indeed, the Board would be hard pressed to pursue the argument relied on by the Regional Director.  Although offering benefits conditioned upon a pre-election demonstration of an employee's support has certainly been scrutinized by the Board, <u>Crestwood Manor</u> and other decisions clearly demonstrate that offering benefits conditioned upon a union victory is inappropriate whether or not a pre-election show of support is required. Furthermore, <u>Nu Skin</u> involved a pre-election distribution of t-shirts known to be of nominal value. 307 NLRB at 223.  The Board relied on the fact that the employees knew the t-shirts had nominal value and that the Union had a legitimate interest in only distributing shirts with union insignia to employees who actually supported the union. <u>Id.</u> at 223-24.  In contrast, as far as the record suggests, the party promised to Trencor employees involved an unknown, but potentially large, benefit, and the union had no stated interest in promising the party other than to influence employees' votes.

8

that offering a party could not reasonably have been seen as an inducement.[4]  See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 246 (1962) ("The courts may not accept appellate counsel's post hoc rationalizations for agency action; [Securities & Exchange Comm'n v.] Chenery [Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577 (1947)] requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself ...").[5] See also NLRB v. Brookshire Grocery Co., 919 F.2d 359, 367 n.9 (5th Cir. 1990) ("The Board's order can be sustained only on the grounds articulated therein.")

---

[4]Both the dissent and the Board argue that the promise was minimal and could not be expected to influence the election. Nothing in the Regional Director's findings indicates that the benefit offered by the Union was "minimal."  Instead, the findings acknowledge the possible influence of the party could have on employees' votes.  And, although the report concludes that the offer "does not amount to impermissible coercion . . . ," the legal basis for that conclusion--that there was an "absence of linkage between the party and either a pre-election pledge of Union support or an actual vote for the Union ..." is *completely abandoned* by the Board on appeal.  On appeal, the Board argues that any victory party, regardless of any "linkage" between the promised benefit and a Union victory, is permissible.  The Board's appellate lawyers have not simply added citations to support the legal theory relied on below, they have clearly changed the theory why the Union activity was permissible.

[5]The Burlington Truck Lines court went on to quote Chenery at length:
> A simple but fundamental rule of administrative law *** is *** that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action ***.
> [Chenery, 332 U.S. at 196, 67 S.Ct. at 1577]

371 U.S. at 168-69, 83 S.Ct. at 246 (ellipses in original).

9

The Third Circuit decision in L&J Equipment makes the salient point that a one day or one night event might not sway an employee's decision on a matter as important as whether to support Union representation. 745 F.2d at 231. However, L&J Equipment could distinguish the Crestwood Manor raffle since the Third Circuit was presented with a Regional Director and Board determination, "after viewing all the evidence," that "the victory party was truly meant to celebrate any victory and lay the groundwork for a productive union-employee relationship." Id. at 231-32. In contrast, the only determination in this case is that the offer of a party "may have served as a possible inducement to get employees to vote for the Union ... ." There is no indication in the record that the offered "biggest party in the history of Texas" had anything to do with laying the "groundwork for a productive employee-union relationship" or, indeed, was anything more than an inducement to vote for the Union. Although on appeal the Board attempts to justify its decision by arguing that offers of post-election parties categorically do not influence employees, the record does not contain such a finding at any stage of the proceedings.[6]

---

[6]As the Burlington Truck Lines court stated: "[t]he short answer to this attempted justification is that the Commission did not so find." 371 U.S. at 168, 83 S.Ct. at 246.

10

Absent such a finding, this case is not meaningfully distinct from Lou Taylor or Crestwood Manor.[7] The Board stated in Crestwood Manor that "[t]he conditioning of the receipt of benefits on favorable election results is impermissible conduct for parties engaged in the election." 234 NLRB at 1097. Even the potential benefit of $1.18 per employee was considered impermissible by the Board. Id. Our court has also agreed with the Board that the offer of a Christmas party that employees would receive vacation time to attend, even though the employer had traditionally given its employees a Christmas party, was an impermissible inducement when announced the day before the election. Lou Taylor, 564 F.2d at 1175. It is not unreasonable to infer that the Union's offer in this case, also made on the day before the election, represented as much or more economic benefit per employee than the $1.18 in Crestwood Manor or possibly even the unspecified amount in Lou Taylor. The Regional Director drew this inference. The Board cannot acknowledge the potential influence of a conditional inducement by adopting the Regional Director's decision and then

---

[7]We are not, as Judge Garza suggests, indicating that Crestwood Manor overruled prior Board decisions that have addressed the circumstances in which parties are permissible. Crestwood Manor holds that even minor inducements conditioned on a union or company victory can be improper. The few prior Board decisions that have addressed parties offered on the condition of a union victory, as discussed in note 2, supra, rested on case-specific Board findings that the party offered could not reasonably have been perceived as an inducement to vote for the Union. There is no such finding here.

11

expect this court to affirm because it is supposedly axiomatic that this type of inducement does not influence employees.

Accordingly, we cannot uphold the Board's decision to overrule Trencor's objection on this issue. Trencor has presented prima facie evidence that the Union conditioned "the receipt of benefits on favorable election results," which "is impermissible conduct for parties engaged in the election." Crestwood Manor, 234 NLRB at 1097. See also Lou Taylor, 564 F.2d at 1175. We must set aside the order of the Board and remand for an evidentiary hearing and analysis consistent with this court's precedents.

## B. Union "Guarantees"

On August 2, 1995, the day before the election was to be held, the Union distributed flyers that listed numerous "guarantees" by the Union. The purported guarantees included several matters related to Union membership, such as Union dues payments, the right of employees to resign from the Union, the right of employees to file unfair labor practice charges against the Union, and a pledge to seek employee approval of any negotiated collective bargaining agreement. The Union also "guaranteed" that upon its victory, employees' wages, benefits and working benefits would not suffer, and that the Union had negotiated improved terms for employees in every prior first contract negotiation. The Union representative, Bill Fears, signed his name under each guarantee, referring to the document as a signed contract between the Union and employees.

Trencor alleges that by making the guarantees, the Union offered employees "a financial benefit to which they would otherwise not be entitled" in the critical period prior to the election, thereby violating Board rules governing elections. See Mailing Services, Inc., 293 NLRB 565 (1989). We disagree.

The Board decision to overrule this objection was reasonable. Unions are permitted to promise the extension of existing membership benefits to employees. Dart Container of California, 277 NLRB 1369 (1985). Unlike Mailing Services, where free health screening, an existing Union benefit, was actually given to employees before the election, this is merely an unremarkable promise to extend Union benefits to employees after the Union's election. 293 NLRB 565 (1989). Unions may also promise to obtain better terms in the future. NLRB v. Golden Age Beverage, 415 F.2d 26, 30-31 (5th Cir. 1969) (union's promised improvements "fell within the category of customary and legally unobjectionable preelection propaganda"). Trencor's objection to the Union "guarantees" is without merit.

### C. Union's "Catch 22" Tactics

Trencor's better argument relates to the Union's challenge to Trencor executives to make guarantees similar to those offered by the Union.[8] Companies are not allowed to make such

---

[8] The Union challenged Trencor officers to sign and date seven statements:
1. I guarantee the company will never cut wages, benefits, or other working conditions now in effect, unless it is voted on and accepted by a majority of

promises in the period immediately preceding an election,[9] and

_____

workers here at our plant. (The same right union members
have).
***
2.   I guarantee the company will not increase the
employees portion or co-pay for insurance costs, and will
not reduce the present benefits under this plan ever.
***
3.   I guarantee the company will select all future job
openings by seniority and qualifications, rather than
using the favoritism system we now use.  Also if there is
a difference of opinion in the selection process, the
affected party can file a grievance up to and including
arbitration to obtain justice.
***
4.   I guarantee the company will end all favoritism in
the plant, and treat all workers fairly and equally and
stop the special treatment of a few favorites.
***
5.   I guarantee in the future the company will notify
all workers by Thursday of any weekend overtime, or
workers will not be forced to work it, if they choose.
***
6.   I guarantee any worker having a grievance on wages,
benefits, or other working conditions, including any
disciplinary actions, will have the right to present his
or her grievance to top management and if it is not
resolved to the workers satisfaction, the worker shall
have the right steelworker members have to present the
grievance to an impartial arbitrator accepted by both
sides, whose decision will be final and binding on the
company and the worker.
***
7.   Finally, I guarantee the company will allow every
worker a full voice and vote on all matters pertaining to
wages, benefits, and all other working conditions. (The
same right steelworker union members have).
***
If company officials will not sign each and every
guarantee, how can you protect yourself without having
these basic rights? ...

[9]See NLRB v. Exchange Parts Co., 375 U.S. 405, 409 (1964)
("conduct immediately favorable to employees which is undertaken
with the express purpose of impinging upon their freedom of choice
for or against unionization" is illegal) and NLRB v. Varo, Inc.,
425 F.2d 293, 298-99 (5th Cir. 1970) (plant manager's preelection

Trencor argues this challenge put the company in the untenable position of either making illegal promises or appearing to back down from the Union.

Trencor responded to the challenge by printing its own leaflet disputing the Union's guarantees and pointing out that it was prohibited by law from making any type of similar promises. Trencor alleged that Union agent Bill Fears wrote handwritten responses on the face of Trencor's leaflets. Trencor produced one such altered leaflet on which someone had handwritten in the margins[10] that: "THE COMPANY <u>CAN</u> GIVE IT'S [sic] EMPLOYEES A CONTRACT WITHOUT A UNION BEING INVOLVED. IF IT CARED ABOUT ITS WORKERS & WANTED THEM TREATED FAIRLY." (emphasis in original). Trencor alleges that this alteration of its leaflet occurred on the morning of the election, denying Trencor the opportunity to respond to this misrepresentation and putting Trencor in a "false light" because it followed the law. Thus, Trencor argues, the "laboratory

---

statement that "[i]f money is all you people are concerned with, you don't have to go through all of this trouble to get it" was an illegal promise of benefits in violation of § 8(a)(1) of the Labor Management Relations Act).

[10]The handwritten text was connected by an arrow to the typeset text of the company's flier which read:

> Please understand this; the company *by law* cannot guarantee or promise you anything to get you to vote against the Union. What the Union salesman is doing is *trying* to get the company to violate the law by guaranteeing or promising you something so that if it loses the election it can possibly become your representative *even though you don't want it*. The company **will not** violate the law and will not promise or guarantee anything.

(Emphasis in original).

conditions" necessary for the employees' free choice were destroyed. See Home Town Foods, 416 at 396 (5th Cir. 1969) ("'laboratory conditions test' represents an ideal atmosphere in which a free choice may be made by employees, protected from interference by employer, union, Board agent, or other parties"; key is "whether the employees were permitted to register a free choice").

The Board counters that Trencor's responsive leaflet apprised the employees of its views on the Union guarantees and the legal restrictions keeping the company from making similar promises, thereby rebutting the notion that it was backing down from the Union challenge. The Board also argues that there is no evidence that the handwritten message on Trencor's leaflet came from a Union agent or was widely distributed. Ultimately, the Board relies on Midland Nat'l Life Ins. Co., 263 NLRB 127, 131-33 (1982), in which the Board decided that it would "no longer probe into the truth or falsity of the parties' campaign statements and [would not] set elections aside on the basis of misleading campaign statements." The Board contends that because the thrust of Trencor's complaint about the Union challenge is that it was misleading, the Midland doctrine applies and the Board will not invalidate the election on this basis.

16

Accepting Trencor's allegation that the Union was responsible for the election day message,[11] we must decide if the Midland doctrine bars a challenge to the election. This circuit has yet to approve fully the Midland doctrine.[12] Only one Fifth Circuit case cites Midland. See NLRB v. Rolligon Corp., 702 F.2d 589, 597 (5th Cir. 1983). In Rolligon, this court overruled an election challenge where the union misused Board subpoenas two months before the election. Id. at 596-97. Although the court condemned the union's actions, the court agreed "with the Board

_____

[11]The Board argues on appeal that there is no evidence of Union involvement with the handwritten notes on Trencor's leaflets. This borders on the ridiculous. At the top of the same defaced leaflet, in the same handwriting, is written "TRENCOR, WHY DID YOU CUT OFF THE TOP PART OF THIS HANDBILL WE PUT OUT? IS IT [sic] 'GUARANTEE' WAS IN BIG CAPITAL LETTERS?" (emphasis in original). Surely, the reference to the "HANDBILL WE PUT OUT" supports the inference that the Union, who put out the prior handbill, also was responsible for the handwritten messages on Trencor's leaflet. Even if this was not patently obvious, the Board is required to take Trencor's allegations as true given that the Board entered summary judgment for the Union without a hearing. McCarty Farms, 24 F.3d at 729. The Regional Director's report and recommendation, adopted by the Board, accepted the company's allegations as true, and the Board must continue to do so on appeal.

[12]Three other circuits have adopted the Midland doctrine. See NLRB v. Semco Printing Ctr., Inc., 721 F.2d 886, 892 (2d Cir. 1983); NLRB v. Monark Boat Co., 713 F.2d 355, 360 (8th Cir. 1983); NLRB v. Yellow Transp. Co., 709 F.2d 1342 (9th Cir. 1983). However, two other circuits, while approving the Board's decision in a particular case, held that an election might be overturned where "the misrepresentation is so pervasive and the deception so artful that employees will be unable to separate truth from untruth and where their right to a free and fair choice will be affected." Van Dorn Plastic Mach. Co. v. NLRB, 736 F.2d 343, 348 (6th Cir. 1984) (citing NLRB v. New Columbus Nursing Home, Inc., 720 F.2d 726, 728 (1st Cir. 1983); See also NLRB v. Hub Plastics, Inc., 52 F.3d 608 (6th Cir. 1995) (remanding to require NLRB to determine whether union misrepresentation fell within Van Dorn exception to Midland).

17

that setting aside an election in which sixty-three percent of the workers have chosen the union as their representative is not the proper remedy." Id. at 597. The court voiced support for the rationale of Midland, noting that employees are "'mature individuals who are capable of recognizing campaign propaganda for what it is and discounting it.'" NLRB v. Rolligon Corp., 702 F.2d 589, 597 (5th Cir. 1983) (quoting Midland, 263 NLRB at 132 (quoting Shopping Kart Food Market, 228 NLRB 1311 (1977))). However, this court ultimately based its decision on the impact the misrepresentation would have on the election,[13] concluding that there was "substantial evidence in the record to support the Board's conclusion that the union's misconduct was not likely to have created the impression that the Board favored one party over another." Id. Important to the court's conclusion was the fact that the company had two months to respond to the union misconduct but failed to do so. Id. at 596.

Trencor urges that Midland is inapplicable because it is not alleging a simple misrepresentation, but rather is objecting to

--------

[13]The court noted that "both the Board and the courts have shown a reluctance to 'censor or police campaign propaganda unless the misrepresentations are so substantial that the uncoerced desires of the employees cannot be determined.'" Rolligon, 702 F.2d at 597 (quoting NLRB v. Muscogee Lumber Co., 473 F.2d 1364, 1367 (5th Cir. 1973)).

18

the Union's challenging Trencor to make illegal promises on the eve of the election. Trencor contends the illegal challenge falls outside the category of misrepresentation and within the category of "campaign conduct, such as threats, promises, or the like, which interfere with employee free choice" and which the Board is still pledged to protect against under Midland. 263 NLRB at 131-33. We disagree.

The Board's decision to uphold the election on this basis is supported by substantial evidence in the record. Although it is unnecessary to decide the full scope of this court's support of the Midland doctrine, we rely on the overarching principle, recognized in Rolligon, that employees must generally be trusted to sort through election propaganda and posturing in deciding how to vote. Contrary to Trencor's protestations, the gravamen of its complaint is that the Union challenge was misleading, i.e., it put Trencor in a "false light." Trencor's efforts to place the Union conduct outside the "misrepresentation" framework fail because, irrespective of the outer bound of the Midland doctrine, Trencor has not demonstrated that the Union conduct was so deceptive that it inhibited employee free choice. Accordingly, the Board's application of the Midland doctrine to this case was within the wide discretion granted to the Board by Congress. The Union's attempt to challenge Trencor to do something that the Union surely knew the company could not do, on the eve of the election, is not

an honest tactic and certainly not one that should be condoned.[14] However, in this case, Trencor was able to respond to the Union's challenge with its own leaflets outlining the company's position. The fact that the Union placed handwritten messages on some or all of the company's leaflets did not prevent employees from reading the claims of both sides and making their own determinations.[15] We cannot conclude that "the misrepresentation is so pervasive and the deception so artful that employees will be unable to separate truth from untruth and ... their right to a free and fair choice will be affected." See <u>Van Dorn Plastic</u>, 736 F.2d at 348.

---

[14]Trencor also contends that it not so much the misleading Union challenge as its last-minute timing that is objectionable. The company relies on the <u>Kalen Construction Company, Inc.</u>, 321 NLRB No. 94, 1996 WL 387382 (1996), in which the Board recently prohibited companies from changing their paycheck policies as a campaign tactic within 24 hours of a union election. While <u>Kalen</u> imposes a restraint on this particular type of electioneering "speech," and could be vulnerable for that reason, the decision specifically does not apply to "the circulation of campaign literature at any time prior to an election."

[15] The handwritten response to Trencor's statement that the law barred the company from making promises in the period before an election, when read critically, acknowledges by omission that Trencor's statement was accurate. The Union response only states that Trencor could make the requested promises "without a union being involved." See <u>supra</u>, note 10. Although suggesting that Trencor could make the disputed promises, the response does not actually dispute the substance of Trencor's statement. This is not to say that the handwritten response is completely truthful, but we assume that employees can recognize the slanted rhetoric.

## CONCLUSION

For the foregoing reasons, **DENY** the Board's cross-petition for enforcement of its bargaining order, and **REMAND** for further proceedings as described above.

**ENFORCEMENT OF BOARD ORDER DENIED; CASE REMANDED.**

21

REYNALDO G. GARZA, Circuit Judge, dissenting.

While I concur with the majority's treatment of the union's guarantees and its alleged "Catch-22" campaign tactics, I cannot concur with its treatment of the alleged promise of a party and therefore respectfully dissent from its refusal to grant the Board's petition for enforcement. My disagreement extends to several points, as I explain below.

In his report on Trencor's objections to the election, the Regional Director for Region 16 stated as follows with respect to the issue of the party:

> In support of this objection the Employer provided an employee witness who testified that a Union representative told an employee, a Union supporter, that when the Union won the election they were going to have the biggest party in the history of Texas and that he would buy all the food and beer for them. The Union employee supporter then, on or about August 2, 1995, told the Employer witness about the party.
>
> Assuming the Union representative made the above statements at some point prior to the election about a prospective party and even assuming the employee who told of this party was an agent of the Union, such would not be a basis for setting the election aside.
>
> *While the party referred to may have served as a possible inducement to get employees to vote for the Union*, it does not amount to an impermissible coercion of the absence [*sic*] of a linkage between the party and either a pre-election pledge of Union support or an actual vote for the Union. Accordingly, the alleged prospective party cannot be a basis for setting the election aside. See **Nu Skin International, Inc.**, 307 NLRB No. 46. Accordingly, it is recommended this objection be overruled.

22

(emphasis added). The Board adopted the Regional Director's findings and recommendations and overruled Trencor's objections to the election.

The majority states that the Board's legal analysis is flawed, and estops the Board from supplementing its legal citation with additional cases to demonstrate the consistency with which it has treated this issue. The majority also relies upon language in the Board's decision that the party "may have served as a possible inducement." The majority states: "Ultimately, we are persuaded that the Board cannot adopt the recommendation of the Regional Director, which notes that offering a party conditioned on a Union victory 'may have served as a possible inducement' but rests on a flawed legal analysis, and then argue on appeal that offering a party could not reasonably have been seen as an inducement." Maj. op. at 8-9. The majority goes on to reject the Board's legal argument by stating that "[t]he Board's reasoning on appeal might be more persuasive if it comported with the facts administratively found." Maj. op. at 7.

The majority errs in its treatment of the Board's opinion. First, the language the majority alludes to is not a finding of fact on this issue. Even if it was, it is of no legal import because the Board determined that even if true, Trencor's objection failed as a matter of policy because the alleged inducement—offering a victory party—was not an improper inducement, *i.e.* one that would serve as a ground for setting aside the

23

election.  Second, the majority finds error in the Board's adoption of the report when legal authority cited within it is not exactly on point.  Essentially, the majority holds that the Board is estopped from not relying specifically on the *Nu Skin* case and the Board's analysis therein.  What the majority overlooks is that the Board's opinion in *Nu Skin* did nothing more than discuss the topic of unlawful inducements in light of guidance provided by the Supreme Court in *NLRB v. Savair Mfg. Co.,* 414 U.S. 270 (1973), the Court's only decision in this area.  Moreover, the Board's task in an election challenge is not a quest for on-point precedent, but to make an ad hoc determination based on the facts presented or, as here, alleged.  *See Lach Simkins Dental Labs.*, 186 NLRB 671, 672 (1972) (Board will approach the question of whether "laboratory conditions" have been upset on a case-by-case basis).

The Board's opinion states that the promise was minimal and could not have been expected to influence the election.  In this court, the Board argues that the promise was minimal and could not be expected to influence the election.  The Board's appellate brief certainly expresses its position much better than does its opinion in this case, but there is no requirement that the two documents be identical.  In its petition for review, the Board provides a number of cases setting forth the Board's long-held position that an employer or union's simple promise to have a party is not improper, to bolster its argument here that it properly determined the promise of the party was an inducement of *de minimis* proportions.

24

This is not a case where a new legal argument is being introduced into the mix. Rather, the NLRB General Counsel has done additional research for this court and supplied the on-point legal citations.

The majority is quite correct that agencies are not permitted to justify their actions in a judicial review proceeding on different grounds than those they relied upon at the time of that action. For us to sanction this sort of post hoc rationalization would allow agencies to engage in unprincipled decision making and would make us their accomplice. But this is not the type of situation the Court had in mind when it decided *Chenery* and *Burlington Truck Lines*. The Court has stated that "[w]hile we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 285-86 (1974); *see also State of Texas v. United States*, 756 F.2d 419, 427 (5th Cir.), *cert. denied*, 474 U.S. 843 (1985). Because I believe "the agency's path may be reasonably discerned," I would reject Trencor's argument that the Board's appellate argument does not match the reasons guiding its opinion.

In addition to its *Chenery* argument, the majority goes further and states that the Board's decision is foreclosed by the decision of our court in *NLRB v. Lou Taylor, Inc.*, 564 F.2d 1173 (5th Cir. 1977). In that case, the Board sought enforcement of an order finding that an employer violated section 8(a)(1) of the Act and

25

requiring a new election where an employer told its employees before the election that it would pay them to attend its Christmas party and would also pay them for the holiday. The Board ordered the new election "despite the Company's contention that Christmas parties were not new benefits and there were valid reasons for the absence of Christmas parties in the preceding years." *Id.* at 1175. If the employer's argument that the party itself was not improper was of no concern to the Board or to us in our review of its decision, it is abundantly clear that our decision rested on the fact that a monetary benefit was conferred to the employees. The Board has consistently held that parties may not buy votes. *See, e.g.*, *NLRB v. Exchange Parts Co.*, 375 U.S. 405 (1964) (employer's conferral of benefit violated section 8(a)(1)); *Crestwood Manor*, 234 NLRB 1097 (1978) ("laboratory conditions" case holding union's promise to hold $100 raffle to be an improper inducement). The Board has also consistently held that it can be an unfair labor practice for an employer to withhold an ordinarily granted benefit, such as hosting a Christmas party, during the pendency of a campaign. An employer's assertion that the benefit conferred is one it has always given operates as an affirmative defense to an 8(a)(1) charge. That the Board still found a violation makes it plain that the objectionable activity in that case was the promise of a paid holiday and paid attendance.[16]

---

[16] The majority's misinterpretation of this case carries over to its refusal to force Trencor to meet its burden of demonstrating that the alleged impropriety by the union influenced the outcome of

The majority does not find it sufficient, however, to rest on the arguments discussed above, and proceeds to reject the Board's position on this issue. It essentially determines that the Board's *Crestwood Manor* decision overruled, by implication, all previous Board decisions in which an inducement of $1.18 or more was found to be unobjectionable. Maj op. at 4-11 & nn.2-3. As a consequence of this, the majority must be arguing (although it does not state that it is) that this has caused the Board to be acting inconsistent with its own precedent, a basis for us to approach its present position with skepticism. *See I.N.S. v. Cardoza Fonseca*, 480 U.S. 421, 446 n.30 (1987) ("An additional reason for rejecting the INS's request for heightened deference to its position is the inconsistency of the positions the BIA has taken through the years."); *Shaw Supermarkets v. NLRB*, 884 F.2d 34 (1st Cir. 1989) (Board must explain departure from precedent). Even were this argument valid, the Board must have in turn overruled the *Crestwood*

the election, a requirement in "laboratory conditions" cases such as this one. *See, e.g.*, *NLRB v. McCarty Farms*, 24 F.3d 725, 728-30 (5th Cir. 1994); *Vicksburg Hosp. v. NLRB*, 653 F.2d 1070, 1075 (5th Cir. Unit A 1981) ("[e]stablishing that the objectionable activities 'either tended to or did influence the outcome of election' is especially difficult where, as in the case of the Vicksburg Hospital election, the union won by a wide [148-66] margin.") (citations omitted). As *Lou Taylor* is a section 8(a)(1) case, the remedy ordered there cannot be transplanted to a "laboratory conditions" case because a different standard applies. The Board almost invariably overturns an election where it finds unfair labor practices were committed during the pre-election period. *Dal-Tex Optical Co.*, 137 NLRB 1782 (1962). See *Sinclair Co.*, 164 NLRB 261 (1967), *enforced*, 397 F.2d 157 (1st Cir. 1968), *aff'd sub nom. NLRB v. Gissel Packing Co.* 395 U.S. 575 (1969), for a discussion by the Board which separates the two standards within a particular case.

*Manor* decision and abandoned this "$1.18 rule" (again by implication), because it held fourteen years later in *Nu Skin* that the promise of t-shirts (costing from $4 to $5) was unobjectionable.[17]

The Supreme Court has long emphasized that, because the Board is the expert body in the field of labor relations, we are to give "considerable deference" to the Board's position on policy determinations and are not to disturb it "as long as it is rational and consistent with the Act." *NLRB v. Curtin Matheson Scientific*, 494 U.S. 775, 786-87 (1990). Stated another way, as an administrative agency, the NLRB is entitled to the deference announced by the Court in *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 844 (1984). *See ABF Freight Sys. v. NLRB*, 114 S. Ct. 835 (1994) ("When Congress expressly delegates to an administrative agency the authority to make specific policy determinations, courts must give the agency's decision controlling weight unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'); *Stardyne, Inc. v. NLRB*, 41 F.3d 141, 147-48 (3d Cir. 1994) (Board's case-by-case adjudications to fill gaps in Act are analyzed under *Chevron*). We also look to the consistency with which the Board has acted as a factor in deciding whether the

---

[17] The majority's attempt to distinguish *Nu Skin* by noting it was a *pre*-election benefit is unpersuasive, as is the extended footnote in which it attempts to cast doubt upon forty years of Board precedent because of a difference between pre- and post-election benefits that it believes renders suspect the Board's citation of one in the context of the other. Maj. op. at 6-7 nn. 2-3.

agency's action should stand. *Cardoza Fonseca*, 480 U.S. at 446; *NLRB v. New Jersey Bell Tel.*, 936 F.2d 144, 147 (3d Cir. 1991).

Nowhere, perhaps, is this deference greater than when the issue is whether the "laboratory conditions" of the election are alleged to have been upset. Section 9 of the Act gives the Board "the broad duty of providing election procedures and safeguards for elections and a wide discretion in determining when conduct did or did not jeopardize the untrammeled expression of employee free choice." *NLRB v. Sanitary Laundry*, 441 F.2d 1368, 1369 (10th Cir. 1971). The issue before us today, whether the promise of a party is the type of benefit that could reasonably have tended to influence the employees' decision, represents "precisely the type of minor, detailed, interstitial question of labor election policy that Congress asked the Labor Board, not the courts, to decide." *NLRB v. Labor Services, Inc.*, 721 F.2d 13, 18 (1st Cir. 1983) (Breyer, J., dissenting).

In rejecting the Board's determination here, the majority places this court at odds with the positions taken by our sister courts. The Third Circuit considered this precise issue in *NLRB v. L&J Equipment Co.*, 745 F.2d 224 (1984), and, despite the majority's attempt to distinguish it, found the policy to represent a reasonable exercise of its powers. The majority states that the crucial difference between that case and the one before us today is that the Board there made a fact finding that the purpose of the election was to celebrate victory and "lay the groundwork for a

29

productive employee-union relationship." In so distinguishing it, however, the majority by-passes precedent of our court that specifically rejects the "intent to influence" test in favor of the "tendency to influence" test that the Board argues before us today. *See NLRB v. McCarty Farms*, 24 F.3d 725, 731 n.5 (5th Cir. 1994) (discussing the standard). The Third Circuit, incidentally uses the same standard we use, *NLRB v. Clearfield Cheese Co.*, 322 F.2d 89, 93-94 (3d Cir. 1963), making it rather difficult to distinguish its opinion there on the basis that it relied upon the "purpose" as being a satisfactory one. Because the Third Circuit's decision is, therefore, indistinguishable from the situation here, the majority's opinion creates a split with our colleagues on that court. The majority's conclusion also conflicts with favorable commentary on the Board's position on this issue from the First Circuit. *Labor Services*, 721 F.2d at 17 (Board "properly held" in *Movsovitz* that promise to buy beer and wine after election "could not reasonably be expected to have influenced the employees' free choice.")

Reviewed under the proper standard, the Board's policy must stand. Its position has been uniform for decades, as the majority opinion clearly demonstrates. Maj. op. at 6-7 n.2. Because Congress did not mandate an outcome here but expressly left it to the Board to decide, it cannot be said that its determination is "manifestly contrary to the statute." Its determination is neither arbitrary nor capricious. We have previously recognized "that

clinical asepsis is an unattainable goal in the real world of union organizational efforts," and accordingly are "conscious of the 'realities of industrial life' in our application of the controlling standard.'" *McCarty Farms*, 24 F.3d at 728 n.2 (citations omitted). The Board has distinguished money payments from parties on the ground that the former closely resembles a bribe, while it is highly unlikely employees will vote against their better interests merely on the promise of a party. As the majority recognizes in its discussion of the Board's *Midland* decision, employees must be viewed as mature individuals. Maj. op. at 16-19. As such, the union organizer's Texas-sized boasts about the party aside, the Board's determination that the promise of the party was not one that destroyed the laboratory conditions of the election is entirely reasonable and should be upheld.

In sum, I believe that the Board's opinion reflects the same argument it advances on judicial review, that its position is not foreclosed by any precedent of our court, and that the Board's position is not "arbitrary, capricious, or manifestly contrary" to the Act. The employees' 70-26 vote in favor of union representation should be upheld. Accordingly, I would deny Trencor's petition for review and would grant the Board's cross-petition for enforcement of its order.